******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

EVELEIGH, J., with whom ROGERS, C. J., and ESPINOSA, J., join, concurring in part and dissenting in part. I respectfully dissent from the majority's conclusion that the speech at issue in the present case did not constitute unprotected fighting words under the first amendment to the United States constitution. In my view, *State* v. *Szymkiewicz*, 237 Conn. 613, 678 A.2d 478 (1996), is binding on this court. Indeed, the facts underlying present case, in my view, provide even stronger support for a breach of peace conviction. Furthermore, the defendant, Nina C. Baccala, represented to this court in her brief that she "does not . . . challenge . . . the scope of the fighting words exception under the first amendment." We should take her at her word. While I acknowledge that the defendant has argued that this court should do its own analysis under the first amendment, she never retracted this position. The briefing was cast in the light of a claim that our state constitution provided greater protection than the federal constitution and, accordingly, contained an analysis pursuant to this court's opinion in *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992). The majority does not deem such an analysis necessary in view of its position that the first amendment controls. I am of the opinion that the briefing of this issue was woefully inadequate for a constitutional claim. Therefore, I would not have reached that issue. Further, after conducting an analysis under *Geisler*, I would conclude that our state constitution does not afford greater protection then the federal constitution. In the final section, I agree with the defendant that the charge was not sufficient on the issue of imminence and, therefore, I would reverse the trial court's judgment and remand the case for a new trial.

I

FIRST AMENDMENT ANALYSIS

The jury reasonably could have found the following facts. On the evening of September 30, 2013, the defendant drove to a grocery store in Vernon with the intention of retrieving a money transfer. Prior to arriving at the store, the defendant phoned ahead to inquire whether she would be able to retrieve the money transfer.[1] After arriving at the store, the defendant proceeded to the service desk where she began to fill out a money transfer form. Tara Freeman, an assistant manager at the store, approached the defendant and informed her that she would be unable to retrieve her money transfer because she lacked the authority to access the money transfer machine. The defendant became very upset and asked to speak to the manager. Freeman replied that she was the manager, pointing to her name tag and picture on the wall as proof. At this point, the defendant

became belligerent, raised her cane toward Freeman,[2] and began directing every swear word "in the book" at Freeman. The defendant said "fuck you" to Freeman, stated that Freeman was not the manager, and called Freeman a "fat ugly bitch" and a "cunt." The defendant, who did not substantially controvert this account of her tirade,[3] testified that she directed such language at Freeman because she felt hurt as a result of purportedly being misled about the availability of money order services and "was trying to hurt back." Freeman replied by saying "have a good night" to the defendant, who responded by mumbling and saying some "choice words" as she departed the store. The entire encounter lasted between fifteen and twenty minutes.

After an investigation by the police, the defendant was arrested and charged with, inter alia,[4] breach of the peace in the second degree in violation of General Statutes § 53a-181 (a) (5). The case was tried to a jury, which rendered a verdict of guilty on that charge. The trial court rendered a corresponding judgment of conviction and sentenced the defendant to twenty-five days of incarceration.

In my view, even if this court were to reach the merits of a claim under the first amendment, it should fail. Indeed, it is readily apparent that the defendant did not raise such a claim under the federal constitution as an alternative to her state constitutional analysis because *State* v. *Szymkiewicz*, supra, 237 Conn. 613, would be dispositive of such a claim.

The facts of *Szymkiewicz* are strikingly similar to the facts of the present case. In that case, the defendant was shopping at a grocery store in Waterford when she was approached by a store detective. Id., 615. The detective asked the defendant to accompany her to the store manager's office on the mezzanine level. Id. In the office, the detective accused the defendant of shoplifting certain items from the store. Id. Upon hearing the accusation, the defendant "became loud and abusive," and, consequently, the police were called. (Internal quotation marks omitted.) Id. After arriving and conducting a brief investigation, a police officer arrested the defendant for shoplifting. Id. The officer handcuffed the defendant and led her down the stairs. Id. As the defendant was escorted down the stairs from the manager's office by the police officer and the store detective, she said "[f]uck you" several times. (Internal quotation marks omitted.) Id. In addition, she said the following to the store detective: "You fucking bitch. I hope you burn in hell for all eternity." (Internal quotation marks omitted.) Id., 616. She also made an unspecified threat to the store detective. Id. It was also observed that a crowd had begun to form at the bottom of the stairs. Id., 623. On the basis of those facts, the defendant was convicted of violating § 53a-181 (a) (1).[5]

In affirming the breach of the peace conviction, this

court concluded that the defendant's speech constituted fighting words. Id. This court adumbrated the speech of the defendant and the circumstances in which they occurred and concluded that "the defendant's language could have aroused a violent reaction" by the addressees—namely, the store detective and the crowd. Id. The defendant was described as "heated," made an unspecified threat,[6] and directed her hateful, provocative language to those around her as she was escorted outside. Id. Because the test is whether the speech would have caused an average person to respond with violence, the court did not discuss the circumstances of the addressees or the extent to which such circumstances implicated the likelihood of the addressees to respond with immediate violence. Id., 620–24.

In the present case, even if the defendant had adequately briefed her sufficiency of the evidence claim under the federal fighting words standard, on the basis of *Szymkiewicz*, I would conclude that the evidence is sufficient to sustain a conviction. The defendant, in a belligerent and angry manner, used harsh and scornful language designed to debase Freeman. The defendant insulted Freeman on the basis of her gender, body composition, and apparent suitability for her position as a manager of the store. The defendant said "fuck you" to Freeman and called her a "fat ugly bitch." The defendant also used the word "cunt," which is generally recognized as a powerful, offensive, and vile term. During this encounter, the defendant gesticulated her cane at Freeman. Freeman testified that, as a result of her encounter with the defendant, both inside the store and as the result of a later telephone call, she was provided additional security. I would conclude, consistent with *Szymkiewicz*, that the evidence was sufficient to sustain the defendant's conviction.

The majority, however, despite the fact that the defendant disclaimed a first amendment argument, reverses the judgment of conviction on that basis. I do not dispute that the factual circumstances surrounding the speech at issue are relevant. See *State* v. *Szymkiewicz*, supra, 237 Conn. 620 ("the words used by the defendant here and the circumstances in which they were used classify them as 'fighting words' "). The majority's granular level dissection of the circumstances of the addressee in the present case, however, is inconsistent with our case law and is maladapted to the nature of fighting words. From its inception, the federal fighting words standard has embraced a context based approach to determining whether speech constitutes fighting words. See *Chaplinsky* v. *New Hampshire*, 315 U.S. 568, 573, 62 S. Ct. 766, 86 L. Ed. 1031 (1942) (noting that certain speech may constitute fighting words when "said without a disarming smile" [internal quotation marks omitted]). Nevertheless, the test is whether the language would provoke an "average person" to respond with immediate violence. (Internal quotation

marks omitted.) *Texas* v. *Johnson*, 491 U.S. 397, 409, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989); see also *State* v. *Szymkiewicz*, supra, 237 Conn. 620. Context is, of course, critical to understanding what the speaker is expressing. First and foremost, the fighting words must be personally provocative. See *Cohen* v. *California*, 403 U.S. 15, 20, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971) (noting that speech was not used "in this instance" in personally provocative manner). Directing the words "fuck the draft" to no one in particular and burning a flag are examples of speech that, in context, would not be deemed unprotected fighting words because such speech is not the communication of a personally provocative insult. *Texas* v. *Johnson*, supra, 398; see also *Cohen* v. *California*, supra, 20. When the abusive language is directed to a particular person, the level of outrage certain words are likely to engender is correlated to how insulting certain words are to that person. Language that targets certain personal attributes that have served as bases for subjugation and dehumanization when directed to individuals with those attributes is among the most harmful. For this reason, racial epithets are more likely fighting words when addressed to a member of the race which the epithet is designed to demean. See *In re Spivey*, 345 N.C. 404, 414, 480 S.E.2d 693 (1997) ("[n]o fact is more generally known than that a white man who calls a black man a 'nigger' within his hearing will hurt and anger the black man and often provoke him to confront the white man and retaliate"). Context is necessary to determine if and to what extent speech is offensive and provocative to the addressee.

The circumstances of the addressee are not wholly irrelevant to the determination of whether a defendant's speech is protected. For there to be an immediate violent reaction by the addressee, there must be some physical proximity between the speaker and the addressee. See *Hershfield* v. *Commonwealth*, 14 Va. App. 381, 384, 417 S.E.2d 876 (1992) (distance and barriers between defendant and addressee precluded immediate violent reaction); see also *Anniskette* v. *State*, 489 P.2d 1012, 1014–15 (Alaska 1971) (finding abusive language uttered to state police officer over phone not fighting words); *State* v. *Dugan*, 369 Mont. 39, 54, 303 P.3d 755 (holding speech not to be fighting words when defendant called victim services advocate " 'fucking cunt' " over the phone), cert. denied,      U.S.      , 134 S. Ct. 220, 187 L. Ed. 2d 143 (2013). Without this physical proximity, there is simply no threat of immediate violence from abusive language.

Evaluating whether the circumstances of the addressee are such that he or she would be likely to respond with immediate violence is a more delicate matter. Although furnished with more than one opportunity, the United States Supreme Court has declined to adopt a rule that the fighting words doctrine applies

more narrowly to speech addressed to a police officer. In a concurring opinion, Justice Powell once suggested that "a properly trained officer *may* reasonably be expected to exercise a higher degree of restraint than the average citizen, and thus be less likely to respond belligerently to fighting words." (Emphasis added; internal quotation marks omitted.) *Lewis* v. *New Orleans*, 415 U.S. 130, 135, 94 S. Ct. 970, 39 L. Ed. 2d 214 (1974). Thirteen years later, Justice Brennan, writing for the court, took note of Justice Powell's suggestion, but couched his language in extreme caution. *Houston* v. *Hill*, 482 U.S. 451, 462, 107 S. Ct. 2502, 96 L. Ed. 2d 398 (1987). Far from embracing a narrower rule for speech directed at police officers, the court observed that "in *Lewis*, Justice Powell *suggested* that even the fighting words exception recognized in *Chaplinsky* . . . *might* require a narrower application in cases involving words addressed to a police officer, because a properly trained officer *may* reasonably be expected to exercise a higher degree of restraint than the average citizen . . . ." (Emphasis added; internal quotation marks omitted.) Id. The court demonstrated this reluctance for a narrower application despite stressing the importance of individual freedom to challenge police action. See id., 462–63. ("[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state"). Nevertheless, this court has expressly adopted a narrower application of the fighting words standard for speech addressed to police officer, at least with respect to § 53a-181 (a) (3). See *State* v. *DeLoreto*, 265 Conn. 145, 169, 827 A.2d 671 (2003).[7]

The reluctance of the United States Supreme Court to embrace an approach that more closely evaluates the circumstances of the addressee is understandable given the fact that that such an approach is maladapted to the nature of fighting words. Fighting words are unprotected speech because they tend to provoke an immediate, visceral response in a face to face situation "because of their raw effect." *State* v. *Caracoglia*, 78 Conn. App. 98, 110, 826 A.2d 192, cert. denied, 266 Conn. 903, 832 A.2d 65 (2003); see also *State* v. *Swoboda*, 658 S.W.2d 24, 26 (Mo. 1983) ("such words must be likely to incite the *reflexive* response in the person to whom, individually, the remark is addressed" [emphasis added]). Ideally, no one would ever respond to abusive speech with violence especially given the likelihood of criminal, professional, or other collateral consequences that could result from violent conduct. Nevertheless, fighting words are so pernicious that they tend to provoke an ordinary person to respond viscerally to scathing insults in a manner that is invariably irrational—that is, with violence. For this reason, a post hoc analysis of the circumstances of the addressee will not accurately reflect whether an ordinary person would reflexively

respond with some degree of violence[8] to a defendant's abusive language.

There is simply no evidence in the record regarding what the average store manager knows or does not know. It is interesting that the majority uses the store as a line of demarcation, noting that "a different conclusion might be warranted if the defendant directed the same words at Freeman after Freeman ended her work day and left the [store], depending on the circumstances presented." Such a demarcation was never mentioned in *Szymkiewicz*. The majority further concludes that "it would be unlikely for an on duty store manager in Freeman's position to respond in kind to the defendant's angry diatribe with similar expletives" and that "[i]t would be considerably more unlikely for a person in Freeman's position . . . to respond with a physical act of violence." It is interesting that the jury in the present case found precisely what the majority deems so unlikely. This is a new test for fighting words directed at the position of the person to whom the words are directed. The United States Supreme Court has not gone this far. In view of the fact that this matter is analyzed under the first amendment, I would follow the case law of the United States Supreme Court and require that the test be restricted to that of the average person. See *Texas* v. *Johnson*, supra, 491 U.S. 409.[9]

## II

### INADEQUATE BRIEFING

I next turn to whether the evidence was sufficient to sustain the defendant's conviction for violation of § 53a-181 (a) (5). The state claims that the evidence is sufficient to sustain the conviction because the defendant's abusive epithets were likely to provoke an ordinary person to respond with immediate violence. The defendant, however, rested her entire sufficiency of the evidence claim on her position that the state constitution protected the defendant's speech because she did not expressly challenge Freeman to a fight. Indeed, the defendant expressly represented that she "does not . . . challenge . . . the scope of the fighting words exception under the first amendment." Thereafter, in a mere footnote, the defendant indicates that she "does not concede" that her speech was unprotected by the first amendment and claims that we must analyze the sufficiency of the evidence under the first amendment standard if that standard is adopted as a matter of state constitutional law. The defendant, however, does not provide such an analysis herself. Similarly, in her reply brief, the defendant claims, without citing a single case, that whether her speech is protected in this case is based on whether an ordinary store manager, rather than an ordinary person, would have responded with immediate violence. Because the defendant has failed to adequately brief the issue of whether the evidence in this case is sufficient under the federal fighting words

standard, I would decline to address it.

"We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs." (Citation omitted; internal quotation marks omitted.) *State* v. *Buhl*, 321 Conn. 688, 724, 138 A.3d 868 (2016). "Claims are also inadequately briefed when they . . . consist of conclusory assertions . . . with no mention of relevant authority and minimal or no citations from the record." (Internal quotation marks omitted.) *Rock* v. *University of Connecticut*, 323 Conn. 26, 33, 144 A.3d 420 (2016); see also *Getty Properties Corp.* v. *ATKR, LLC*, 315 Conn. 387, 413–14, 107 A.3d 931 (2015).

Moreover, we have recently emphasized the importance of adequate briefing of free speech issues due to the analytic complexity of the subject matter. See *State* v. *Buhl*, supra, 321 Conn. 726. "[F]irst [a]mendment jurisprudence is a vast and complicated body of law that grows with each passing day and involves complicated and nuanced constitutional concepts." (Internal quotation marks omitted.) Id. In *Buhl*, this court affirmed the Appellate Court's decision not to review the defendant's free speech claims because those claims were inadequately briefed. Id. Specifically, we noted that the defendant in that case dedicated one and one-half pages and cited three to six cases for each of two separate expressive liberties issues. Id., 726–27.

In the present case, the defendant provided a thorough and thoughtful *Geisler* analysis in support of her claim that the free speech provisions of the Connecticut constitution provided additional protections that encompassed her speech. As the defendant acknowledges, the federal constitutional standard is the floor for individual rights. *Trusz* v. *UBS Realty Investors, LLC*, 319 Conn. 175, 191, 123 A.3d 1212 (2015). Naturally, if the defendant truly contended this minimum standard was unmet, an analysis of the governing law under the first amendment would be necessary to evaluate that claim. Instead, the defendant simply maintains that she "does not concede" that her language was not protected by the first amendment. In a mere footnote, she maintains that if this court "concludes that the Connecticut constitution is coextensive with the [United States] constitution, [it] must still decide whether the evidence was sufficient under the standard that it delineates." Similarly, in her reply brief and without citation to any case law, the defendant claims that this court should consider whether an ordinary grocery store manager would have responded to the defendant's

speech with imminent violence. The defendant does not, however, cite any case law in support of this formulation of the first amendment standard. Even in her reply brief, after the state had made its claim that the standard under the first amendment is whether an *ordinary person* would respond with immediate violence, the defendant declined to respond with any analysis or authority to the contrary. Given the foregoing circumstances, I would conclude that any federal constitutional claim has been waived as a result of inadequate briefing.[10]

## III

## GEISLER ANALYSIS

The defendant claims that the evidence was not sufficient to support her conviction of breach of peace. Specifically, the defendant claims that the jury could not have properly determined that her speech fell within the scope of the fighting words exception to the Connecticut constitution's free speech provisions.[11] The defendant claims that the Connecticut constitution affords broader protection for speech than the United States constitution in that the scope of the fighting words doctrine is narrowly circumscribed under the Connecticut constitution to speech that challenges the listener to fight. According to the defendant, because the record is devoid of any evidence of a challenge to fight, there was not sufficient evidence to support her conviction. The state maintains that the fighting words doctrine under the state constitution is coterminous with the United States constitution and, therefore, the evidence is sufficient to support the defendant's conviction. I agree with the state.

I begin by setting forth this court's standard of review in free speech cases. The "inquiry into the protected status of . . . speech is one of law, not fact." (Internal quotation marks omitted.) *DiMartino* v. *Richens*, 263 Conn. 639, 661, 822 A.2d 205 (2003); see also *Connick* v. *Myers*, 461 U.S. 138, 148 n.7, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983). "This [c]ourt's duty is not limited to the elaboration of constitutional principles; we must also in proper cases review the evidence to make certain that those principles have been constitutionally applied. This is such a case, particularly since the question is one of alleged trespass across the line between speech unconditionally guaranteed and speech which may legitimately be regulated." (Internal quotation marks omitted.) *State* v. *DeLoreto*, supra, 265 Conn. 152–53. In cases where the line must be drawn, this court undertakes an examination of the speech at issue, along with the circumstances under which it was made, to see whether it is of a nature which the relevant constitutional free speech provisions protect. See id., 153. This court "must make an independent examination of the whole record . . . so as to [be sure] that the judgment does not constitute a forbidden intrusion on the field

of free expression." (Internal quotation marks omitted.) Id. Although the ultimate conclusion with respect to whether the speech at issue constitutes fighting words is subject to de novo review, this court accepts "all subsidiary credibility determinations and findings that are not clearly erroneous." *State* v. *Krijger*, 313 Conn. 434, 447, 97 A.3d 946 (2014).

To the extent that § 53a-181 (a) (5) proscribes conduct consisting of pure speech, this court and the Appellate Court have applied a judicial gloss in order to ensure that the statute comports with the strictures of the first amendment. See *State* v. *Caracoglia*, supra, 78 Conn. App. 110; see also *State* v. *Szymkiewicz*, supra, 237 Conn. 620–21 (applying fighting words construction to § 53a-181 [a] [1], which prohibits "violent, threatening or tumultuous behavior"); cf. *State* v. *Indrisano*, 228 Conn. 795, 812, 640 A.2d 986 (1994) (applying fighting words construction to provision of disorderly conduct statute, General Statutes § 53a-182 [a] [1], prohibiting "violent, threatening or tumultuous behavior").

The fighting words exception to the broad free speech protection afforded by the first amendment was first articulated in *Chaplinsky* v. *New Hampshire*, supra, 315 U.S. 568. In that case, the United States Supreme Court held that states are permitted to punish the use of certain narrow classes of speech, including " 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." Id., 572. As discussed previously in this concurring and dissenting opinion, fighting words are "speech that has a direct tendency to cause imminent acts of violence or an immediate breach of the peace. Such speech must be of such a nature that it is likely to provoke the average person to retaliation." (Internal quotation marks omitted.) *State* v. *Szymkiewicz*, supra, 237 Conn. 620; see also *Texas* v. *Johnson*, supra, 491 U.S. 409. In order to constitute fighting words, the abusive language must be "directed to the person of the hearer." (Internal quotation marks omitted.) *Cohen* v. *California*, supra, 403 U.S. 20. Accordingly, in order to comport with the requirements of the first amendment, § 53a-181 (a) (5) "proscribes fighting words that tend to induce immediate violence by the person or persons to whom the words are uttered because of their raw effect." *State* v. *Caracoglia*, supra, 78 Conn. App. 110.

"[F]ederal constitutional and statutory law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher level of protection for such rights." (Internal quotation marks omitted.) *Trusz* v. *UBS Realty Investors, LLC*, supra, 319 Conn. 191. In order to determine whether the Connecticut constitution affords broader protection than the national minimum, this court analyzes the familiar *Geisler* factors: "(1) the 'textual' approach—consideration of the spe-

cific words in the constitution; (2) holdings and dicta of this court and the Appellate Court; (3) federal precedent; (4) the 'sibling' approach—examination of other states' decisions; (5) the 'historical' approach—including consideration of the historical constitutional setting and the debates of the framers; and (6) economic and sociological, or public policy, considerations." *State* v. *Linares*, 232 Conn. 345, 379, 655 A.2d 737 (1995).[12]

### A

I begin my analysis by looking at the text of the relevant constitutional provisions. Article first, § 4, of the Connecticut constitution provides that "[e]very citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty." Article first, § 5, of the Connecticut constitution provides that "[n]o law shall ever be passed to curtail or restrain the liberty of speech or of the press." The defendant contends that the protection of speech "on all subjects" extends to the "profane name-calling" in which the defendant indulged in the present case. The state points out that the protection afforded by article first, § 4, of the Connecticut constitution is not unbounded, but rather is circumscribed by the qualifying language "being responsible for the abuse of that liberty."

Broadly speaking, we have previously observed "that because, unlike the first amendment to the federal constitution: (1) article first, § 4, of the Connecticut constitution includes language protecting free speech on all subjects; [and] (2) article first, § 5, of the Connecticut constitution uses the word ever, thereby providing additional emphasis to the force of the provision . . . and therefore sets forth free speech rights more emphatically than its federal counterpart . . . ." (Citations omitted; internal quotation marks omitted.) *Trusz* v. *UBS Realty Investors, LLC*, supra, 319 Conn. 192–93. Specifically, this court noted that the state constitutional liberty to speak freely *on all subjects* set forth in § 4 "support[ed] the conclusion that the state constitution protects employee speech in the public workplace on the widest possible range of topics, as long as the speech does not undermine the employer's legitimate interest in maintaining discipline, harmony and efficiency in the workplace." Id., 193.

Nevertheless, the liberty to speak freely on all subjects is qualified by the plain terms of article first, § 4, of the Connecticut constitution, which holds each citizen "responsible for the abuse of that liberty." This court has observed that this provision operates as a limitation upon the broad protections otherwise afforded by permitting the enforcement of laws regulating speech that tended to cause a breach of the peace such as defamation or sedition. See *Cologne* v. *Westfarms Associates*, 192 Conn. 48, 64 n.9, 469 A.2d 1201 (1984).[13] Therefore, this court has interpreted the text of § 4 to permit pun-

ishment, within certain bounds, of abuse of the freedom of speech. Additionally, the text of §§ 4 and 5 in no way suggests that the legislature's authority to punish abuses of expressive liberties was limited to then prevailing statutory criminal law. Thus, while the language of §§ 4 and 5 provides for broader protection than afforded under the federal constitution, the language of § 4 more directly pertains to the state's authority to punish the abuse of expressive liberties. Accordingly, I find that the text of §§ 4 and 5 does not support the defendant's position that our state constitution defines the concept fighting words more narrowly.

B

I turn next to historical analysis to further clarify the scope of the state's expressive rights protections. The historical analysis is the central focus of the defendant's constitutional claim. She advances the theory that the only exceptions to the broad expressive rights protections afforded by the Connecticut constitution are those extant at the time of the ratification of the Connecticut constitution in 1818, and that there was no statute proscribing profane name calling at that time.[14] As a result, according to the defendant, in light of the statutory law at the time of ratification, the state may only punish abusive language that includes a challenge to fight. The state, on other hand, points to preconstitutional records that, in very general terms, support the qualified character of the civil liberties.[15] I agree with the state.

Contrary to the defendant's contention, ratification era constitutional law is not the sole source of state constitutional principles. Indeed, the common law provides valuable insight to inform our understanding of constitutional principles. See E. Peters, "Common Law Antecedents of Constitutional Law in Connecticut," 53 Alb. L. Rev. 259, 264 (1989) ("In defining and enacting constitutional bills of rights, state and national constituencies would, of course, have drawn upon the experience of the common law. . . . Just as the precepts of the common law influence the style of constitutional adjudication in common law courts, so common law case law itself is part of our 'usable past.' " [Footnote omitted.]). In 1828, this court observed that when a person sends a letter containing "abusive language" to another person, it was "an indictable offence, because it tends to a breach of the peace." *State* v. *Avery*, 7 Conn. 266, 269 (1828).[16] The court noted that, while the letter would not constitute libel because it was not published to a third party, it was "clearly an offence of a public nature, and punishable as such, as it tends to create ill-blood, and cause a disturbance of the public peace." Id. This common law offense originated in England where it was observed that sending an "infamous" letter to another person constituted an "offense to the King, and is a great motive to revenge, and tends to the breaking of the peace . . . ." *Edwards* v. *Wooton*,

77 Eng. Rep. 1316, 1316–17 (K.B. 1655); see also *Hickes's Case*, 79 Eng. Rep. 1240, 1240–41 (K.B. 1682). Chief Justice Zephaniah Swift included the common-law offense of provocation to breach of the peace in the second volume of his digest published in 1823. See 2 Z. Swift, A Digest of the Laws of the State of Connecticut (1823) pp. 340–41.[17] At the very least, Connecticut common law embraced the principle that speech that tended to cause a breach of the peace was illegitimate, even if it did not acknowledge such conduct as a basis for criminal liability.[18] Indeed, this very rationale undergirds the fighting words doctrine. See *Chaplinsky* v. *New Hampshire*, supra, 315 U.S. 573 (noting that it is within domain of state power to punish "words likely to cause a breach of the peace").

Additionally, the defendant has failed to articulate a persuasive rationale for relying strictly upon historical exceptions in any form. The defendant correctly points out that this court previously has recognized that "our constitution's speech provisions reflect a unique historical experience and a move toward enhanced civil liberties, particularly those liberties designed to foster individuality. . . . This historical background indicates that the framers of our constitution contemplated vibrant public speech, and a minimum of governmental interference . . . ." (Internal quotation marks omitted.) *Trusz* v. *UBS Realty Investors, LLC*, supra, 319 Conn. 206. However, this broad observation about the historical context in which the declaration of rights was adopted does not support any particular analytic framework for delineating the scope of expressive rights doctrine, let alone the one advanced by the defendant. In sum, there is no basis for the 1818 code alone to serve as the lodestar of present day state constitutional expressive rights doctrine. Accordingly, I find this factor supports the state.

### C

I next turn to the state precedents factor of the *Geisler* analysis. The defendant contends that, because this court has yet to delineate the scope of the fighting words doctrine under the Connecticut constitution, this court writes on a "clean slate."[19] The state claims that, while this court's cases have expressly held that the Connecticut constitution "bestows greater expressive rights on the public than that afforded by the federal constitution"; see *State* v. *Linares*, supra, 232 Conn. 380; appellate cases discussing state freedom of expression principles evince a philosophy that balances individual expressive liberties and the responsibility not to abuse such liberties.[20] I agree with the state.

This court's more recent state constitutional expressive rights cases show that Connecticut's constitution provides broader freedom of expression protections than the federal counterpart. See, e.g., *Trusz* v. *UBS Realty Investors, LLC*, supra, 319 Conn. 196; *State* v.

*Linares*, supra, 232 Conn. 382. In *Linares*, this court was called upon to determine proper state constitutional analytic framework for time, place, and manner restrictions upon expression in a case challenging a statute prohibiting disturbances in the General Assembly. This court rejected the more modern, categorical federal forum analysis in favor of the older, flexible, case-by-case approach set forth in *Grayned* v. *Rockford*, 408 U.S. 104, 115–21, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972). Likewise, in *Trusz*, this court rejected the more recent—and more restrictive—federal standard analyzing employee expressive rights claims set forth in *Garcetti* v. *Ceballos*, 547 U.S. 410, 418–20, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006), in favor of a modified version of the older, more flexible *Connick/Pickering*[21] standard.[22] As mentioned previously, both *Trusz* and *Linares* denote a state constitutional preference for preserving individual liberties when the United States Supreme Court diminishes the scope of such liberties under the federal constitution. See footnote 19 of this concurring and dissenting opinion. In contrast, in *Cologne* v. *Westfarms Associates*, supra, 192 Conn. 66, this court rejected the novel theory that private shopping malls were required to permit solicitation under the Connecticut constitution. Thus, while it is true that Connecticut's constitution guarantees broad expressive rights—a broader guarantee than the United States constitution—it does not provide additional protection in each and every facet of the broad field of expressive rights.

The appellate case law analyzing state constitutional principles with respect to content based regulation of speech embraces a philosophy that balances the expressive liberties with the responsibility not to abuse such liberties. In *State* v. *McKee*, 73 Conn. 18, 28, 46 A. 409 (1900), this court affirmed the denial of a demurrer challenging, inter alia, the validity of a statute punishing the publication of "criminal news, police reports, or pictures and stories of deeds of bloodshed, lust, or crime." (Internal quotation marks omitted.) Rather than looking to the substantive criminal law extant at the time of ratification of the state constitution in 1818 to determine the validity of this more recent statutory offense as the defendant urges, Justice Hamersley relied on the broader principles of expressive liberty to sustain the statute. Id., 28. Speaking for a unanimous court, he elaborated that expressive liberties are "essential to the successful operation of free government," and acknowledged "free expression of opinion on any subject as essential to a condition of civil liberty." Id. Nevertheless, Justice Hamersley acknowledged the qualified nature of expressive liberties, noting that "[i]mmunity in the mischievous use is as inconsistent with civil liberty as prohibition of the harmless use. Both arise from the equal right of all to protection of law in the enjoyment of individual freedom of action, which is the ultimate fundamental principle." Id., 28–29. He continued,

"[f]reedom of speech and press does not include the abuse of the power of tongue or pen, any more than freedom of other action includes an injurious use of one's occupation, business, or property." Id., 29. On this issue, Justice Hamersley concluded that the notion that the state constitution created a refuge for those who sought to abuse expressive liberties to the detriment of society "belittle[d] the conception of constitutional safeguards and implie[d] ignorance of the essentials of civil liberty." Id.

These principles of civil liberty are interwoven into this court's reasoning in subsequent cases rejecting state constitutional free speech challenges to statutes proscribing abuse of expressive liberties. In *State* v. *Pape*, 90 Conn. 98, 103, 96 A. 313 (1916), this court reversed a demurrer that had dismissed an information filed against the defendant alleging that the defendant had published, if proven untrue, abusive and scurrilous allegations of corruption and breach of office by indicating that a public official "had sold out his constituents and traded their wishes and interests and his own soul for an office." This court reasserted that the legislature may not "curtail the liberty of speech or of the press, guaranteed as it is by our [c]onstitution." Id., 105. The court also noted that expressive rights principles derive from the common law, and that it was a common law principle that "free and fair criticism on any subject reasonably open to public discussion is not defamation and is not libelous . . . ." Id. In other words, "[l]iberty of speech and of the press is not license, not lawlessness, but the right to fairly criticize and comment." Id. The court noted that it was a right for the defendant to fairly comment upon the conduct of the public official, but the defendant would bear the responsibility for the abuse of that right. Id.

Similarly, in *State* v. *Sinchuk*, 96 Conn. 605, 616, 115 A. 33 (1921), this court upheld a seditious libel law[23] challenged on state expressive rights grounds. The defendants advanced the theory that the statute punished expression irrespective of harmful consequence. Id., 607. This court conceded that publication of scurrilous or abusive matter concerning the federal government does not necessarily result in direct incitement to lawlessness, but, nevertheless, the legislature was permitted to declare that such expression endangers public peace and safety unless the court found such conclusion to be plainly unfounded. Id., 609–10. In so reasoning, the court acknowledged the breadth of legislative authority to regulate speech that may be harmful to public peace. Id.

The defendant correctly points out that the narrow holdings of these early twentieth century expressive rights cases would not likely withstand modern constitutional scrutiny.[24] The defendant is incorrect, however, that because the cases provide no evidence of the scope

of expressive rights protection in 1818, that they provide no meaningful insight to our analysis.[25] With respect to the issue at hand, these cases evince a philosophy not dissimilar from that prevailing in 1818—namely, the belief that citizens should be free to express themselves, but that they bear responsibility for the abuse of that right. Moreover, this court's reliance on preconstitutional common-law principles to inform the scope of state constitutional rights undercuts the defendant's theory that early nineteenth century *statutory* criminal law delineates the scope of expressive rights. For these reasons, the state precedents factor favors the state's position.

D

Next, I turn to the sister state precedents factor of the *Geisler* analysis. The defendant urges this court to adopt the approach followed by Oregon. The state does not rely on this factor for its position, but asserts that the Oregon approach is inconsistent with Connecticut constitutional jurisprudence. I agree with the state.

The Oregon Supreme Court has concluded that its constitutional expressive rights provision[26] "forecloses the enactment of any law written in terms directed to the substance of any 'opinion' or any 'subject' of communication, unless the scope of the restraint is wholly confined within some historical exception that was well established when the first American guarantees of freedom of expression were adopted and that the guarantees then or in 1859 demonstrably were not intended to reach." *State* v. *Robertson*, 293 Or. 402, 412, 649 P.2d 569 (1982). Applying this test, the Oregon Court of Appeals held a harassment statute under which the defendant had been convicted for calling another person a "fucking nigger" to be unconstitutional because using abusive language was not a historical exception to speech rights at the time of ratification of the Oregon constitution. (Internal quotation marks omitted.) *State* v. *Harrington*, 67 Or. App. 608, 610, 615–16, 680 P.2d 666, cert. denied, 297 Or. 547, 685 P.2d 998 (1984). *Harrington* concluded that the *Chaplinsky* standard employed a balancing test to determine whether speech was protected whereas the Oregon constitution prohibited "restricting the right to speak freely on *any subject whatever.*" (Internal quotation marks omitted; emphasis in original.) Id., 614.

The Oregon approach is inapposite to determining the protections afforded by the Connecticut constitution because that state employs a different analytic approach to delineating the scope of state constitutional provisions. The Oregon approach is a mechanistic, single-factor approach that focuses solely on statutory substantive criminal law extant contemporaneously with ratification of its constitution. Connecticut, by relying upon the *Geisler* factors, embraces a "structured and comprehensive approach to state constitutional inter-

pretation . . . ." (Internal quotation marks omitted.) *Connecticut Coalition for Justice in Education Funding, Inc.* v. *Rell*, 295 Conn. 240, 272 n.26, 990 A.2d 206 (2010). This multifactor approach provides a more extensive toolkit to fashion appropriate, principled constitutional rules. See also *Honulik* v. *Greenwich*, 293 Conn. 641, 648, 980 A.2d 845, (2009) (noting that the factors are "to be considered in construing the contours of our state constitution so that we may reach reasoned and principled results as to its meaning"). Additionally, the defendant has done little to persuade why Oregon's historical exception approach, other than her own conclusion that it is "logical," is the appropriate test to delineate the scope of expressive rights under the Connecticut constitution. Nor does the Oregon Supreme Court articulate a persuasive basis for adopting such an approach. Indeed, *Robertson* appears to have adopted it strictly from the plain language of the relevant constitutional provision, which differs at least in form, if not substance, from Connecticut's relevant constitutional text. *State* v. *Robertson*, supra, 293 Or. 412; see also footnote 26 of this opinion.

The only other state to have considered the fighting words doctrine under its own expressive rights provisions is Vermont, and the Vermont Supreme Court determined, in a challenge to the "abusive language" prong of its disorderly conduct statute, that its state constitution does not offer broader protection that the federal constitution with respect to the fighting words doctrine. (Internal quotation marks omitted.) *State* v. *Read*, 165 Vt. 141, 156, 680 A.2d 944 (1996). The court began its discussion by noting that, while Vermont's constitution "may afford greater protection to individual rights than do the provisions of the federal charter," the court had previously indicated that expressive rights are coterminous under the state and federal constitution but had reserved final judgment on the issue. (Internal quotation marks omitted.) Id., 153. In *Read*, the defendant had made textual, comparative, and historical arguments that his speech was protected. Id., 152–53. The court rejected his argument that the Vermont constitution offers broader protection by virtue of the fact that it contains no fewer than four speech provisions and that none of those provisions qualify expressive rights with the imposition of responsibility for the abuse thereof. Id., 153–54. The defendant in *Read* further contended that Vermont was historically tolerant of abusive language.[27] Id., 154. While the court generally accepted the defendant's characterization of contemporary social norms, it rejected the defendant's historical argument by relying principally upon a statement by the Vermont governor and council, made in response to Kentucky and Virginia resolutions espousing nullification of the Sedition Act, that strongly indicated that Vermont's constitutional expressive rights provisions afforded no broader protection than the first amend-

ment.[28] Id., 155. The court concluded that the defendant had failed to satisfy its burden of showing that the Vermont constitution protected his speech. Id., 156.

My research reveals that, other than Oregon, no other state's constitution provides additional protection with respect to fighting words. Additionally, I find Oregon law to be unpersuasive. Accordingly, the sister state precedent factor favors the state.

### E

I next address the federal precedents factor of *Geisler*. The defendant claims that one of the principal theoretical underpinnings of the fighting words doctrine has diminished since the inception of the doctrine. Specifically, the defendant claims that the United States Supreme Court acknowledges the expressive value of fighting words, whereas the court previously had found fighting words to be of little value at all. The state, on the other hand, points to the fact that the United States Supreme Court has not strayed from *Chaplinsky* and that the doctrine continues to endure. The state also maintains that, while the United States Supreme Court did acknowledge the expressive value of fighting words, it also reasoned that such words may be proscribed because they constitute a " 'nonspeech' element of communication . . . analogous to a noisy sound truck . . . ." *R. A. V.* v. *St. Paul*, 505 U.S. 377, 386, 112 S. Ct. 2538, 120 L. Ed. 2d 305 (1992). Finally, the state points to *Cantwell* v. *Connecticut*, 310 U.S. 296, 60 S. Ct. 900, 84 L. Ed. 1213 (1940), which is the antecedent of *Chaplinsky*, as evidence that the scope of the fighting words doctrine under the state and federal constitutions is coextensive. I find this factor favors the state.

I begin by addressing *Cantwell* v. *Connecticut*, supra, 310 U.S. 296,[29] which arose out of the proselytization activities of a group of Jehovah's Witnesses. See *State* v. *Cantwell*, 126 Conn. 1, 3, 8 A.2d 533 (1939), rev'd, 310 U.S. 296, 60 S. Ct. 900, 84 L. Ed. 1213 (1940). The information alleged that a group, a father and his two children, ambulated Cassius Street in New Haven soliciting, without prior approval, the sale of books or donations by offering to play a phonograph recording as part of the pitch. Id. Ninety percent of the residents of the neighborhood were Roman Catholic, and the phonographic recording contained attacks upon the Catholic religion. Id. The defendants in that case were arrested, charged, and convicted of soliciting without a permit and breach of the peace. Id., 2–3 and n.1. The defendants appealed to this court challenging the sufficiency of the evidence supporting the conviction of breach of the peace.[30] Id., 5–6. This court upheld, inter alia, the conviction of one of the three defendants for breach of peace, observing that "[t]he doing of acts or the use of language which, under circumstances of which the person is or should be aware, are calculated or likely to provoke another person or other persons

to acts of immediate violence may constitute a breach of the peace. . . . The effect or tendency of words or conduct depends largely upon the circumstances, and is a question of fact. . . . It is apparent from the facts found that the playing for audition by loyal Catholics of a record violently attacking their religion and church could well be found to constitute the offense charged, and they warrant finding [of] guilty." (Citations omitted.) Id., 7.[31] This court noted the constitutional implications of their reasoning by stating that "the right to propagate religious views is not to be denied," but nevertheless concluded that "one will not be permitted to commit a breach of the peace, under the guise of preaching the gospel."[32] (Internal quotation marks omitted.) Id. That defendant then filed a petition for certification to appeal to the United States Supreme Court, which was granted. *Cantwell* v. *Connecticut*, 309 U.S. 626, 626–27, 60 S. Ct. 589, 84 L. Ed. 987 (1940).

On appeal, the United States Supreme Court reversed on the remaining conviction for breach of the peace. *Cantwell* v. *Connecticut*, supra, 310 U.S. 311. The court found that it would be inconsistent with the principles of expressive liberties to punish the defendant for the content of the phonographic recording. Id., 310. The court reasoned that in a diverse society, religious as well as political discourse will produce sharp differences of belief. Id. "In both fields the tenets of one man may seem the rankest error to his neighbor. To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement." Id. Part of the essence of citizenship, the court observed, is the right to express even offensive beliefs. See id. ("[b]ut the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy").

But the United States Supreme Court also acknowledged the state's interest in preserving peace. Id., 311. The court, in striking a balance between the competing interests, acknowledged that in some circumstances it is appropriate for the state to punish certain speech that tends to provoke violence, noting as follows: "One may, however, be guilty of the offense if he commit acts or make statements likely to provoke violence and disturbance of good order, even though no such eventuality be intended. Decisions to this effect are many, but examination discloses that, in practically all, the provocative language which was held to amount to a breach of the peace consisted of profane, indecent, or abusive remarks directed to the person of the hearer. Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the [United States constitution], and its pun-

ishment as a criminal act would raise no question under that instrument." Id., 309–10. Thus, the United States Supreme Court acknowledged Connecticut's well established authority to regulate speech that tends to provoke violence, but refined that authority to conform to federal free speech principles by permitting regulation of only profane, indecent, or abuse remarks likely to provoke violence. It was this principle that would become the foundation of the fighting words doctrine in *Chaplinsky*.

The factual background of *Chaplinksy*, as in *Cantwell* v. *Connecticut*, supra, 310 U.S. 296, involves proselytization activity by a Jehovah's Witness. *Chaplinsky* v. *New Hampshire*, supra, 315 U.S. 569. On the busy streets of Rochester, New Hampshire, the defendant was distributing the literature of his religion and denouncing other religions as a "racket." (Internal quotation marks omitted.) Id., 569–70. The crowd complained to the city marshal, who informed the crowd that the defendant was engaged in lawful activity, but also warned the defendant that the crowd was becoming restless. Id., 570. After some time, a disturbance ensued, and a nearby traffic officer escorted the defendant toward the police station. Id. En route, the defendant encountered the marshal who was going to the scene of the disturbance. Id. Upon seeing the marshal, the defendant said "[y]ou are a [g]od damned racketeer and a damned [f]ascist and the whole government of Rochester are [f]ascists or agents of [f]ascists . . . ." (Internal quotation marks omitted.) Id., 569. According to the defendant, before uttering the language that predicated the criminal offense, he complained to the marshal about the disturbance and requested that those responsible be arrested. Id., 570. The defendant was charged and convicted under a state statute making it a crime to address any "offensive, derisive or annoying" words at the person of another.[33] (Internal quotation marks omitted.) Id., 569.

In setting forth the applicable expressive rights principles, the United States Supreme Court sketched out their qualified nature. The court observed that it was "well understood that the right of free speech is not absolute at all times and under all circumstances." Id., 571. "There are certain [well defined] and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any [c]onstitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." (Footnote omitted.) Id., 571–72. The court's rationale for exempting certain categories of speech from protection is that "such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social

interest in order and morality." Id., 572. *Chaplinsky* drew further support by quoting *Cantwell* v. *Connecticut*, supra, 310 U.S. 309–10, for the proposition that "[r]esort to epithets or personal abuse" is not protected speech and would raise no question as to its punishment under the constitution. See *Chaplinsky* v. *New Hampshire*, supra, 315 U.S. 572.

Consistent with the principle set forth in *Cantwell*, the court was careful to reiterate that any law punishing pure speech must be narrowly drawn to punish only that speech which tends to cause a breach of the peace. Id., 573. The court noted that the New Hampshire Supreme Court had authoritatively construed the statute in a fashion to conform to this principle by limiting the statute's scope to words that have "direct tendency to cause acts of violence by the person to whom, individually, the remark is addressed," which is to be determined by inquiring whether "men of common intelligence would understand would be words likely to cause an average addressee to fight." (Internal quotation marks omitted.) Id. With respect to the defendant's speech itself, the court concluded, "[a]rgument is unnecessary to demonstrate that the appellations 'damn racketeer' and 'damn Fascist' are epithets likely to provoke the average person to retaliation, and thereby cause a breach of the peace." Id., 574. Thus, the fighting words doctrine itself as articulated in *Chaplinsky* is a step in the evolution of a principle of expressive liberty that draws its very essence from Connecticut, which acknowledges the authority of the state, within narrow limits, to punish pure speech that tends to cause a breach of the peace.

The defendant claims that, since *Chaplinsky*, the United States Supreme Court has viewed the value of fighting words more favorably. Compare *Chaplinsky* v. *New Hampshire*, supra, 315 U.S. 572 ("[r]esort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the [c]onstitution" [internal quotation marks omitted]), with *R. A. V.* v. *St. Paul*, supra, 505 U.S. 384–85 ("[i]t is not true that fighting words have at most a de minimis expressive content . . . or that their content is *in all respects* worthless and undeserving of constitutional protection . . . sometimes they are quite expressive indeed" [internal quotation marks omitted; citations omitted; emphasis in original]). Fighting words, like offensive language more generally, has an emotive communicative function. See *Cohen* v. *California*, supra, 403 U.S. 26 ("[i]n fact, words are often chosen as much for their emotive as their cognitive force"). In other words, the use of offensive language serves as a means to convey the passion with which one holds ideas or beliefs he or she seeks to exchange. Even acknowledging this value, the court maintained that fighting words "constitute no essential part of any exposition of ideas." (Internal quotation marks omitted; emphasis omitted.)

*R. A. V.* v. *St. Paul*, supra, 385. Nevertheless, the federal fighting words doctrine admits the expressive value of abusive words or epithets by protecting such speech and permitting regulation only when such speech would provoke an ordinary person to respond with immediate violence. *Gooding* v. *Wilson*, 405 U.S. 518, 528, 92 S. Ct. 1103, 31 L. Ed. 2d 408 (1972). On the basis of the foregoing, I conclude that federal precedent does not support the defendant's claim that our state constitution permits the punishment fighting words only if the defendant directly invites a fight.

F

Finally, I turn to the public policy factor of the *Geisler* analysis. The defendant asserts that the fighting words doctrine reflects an archaic conception of honor according to which it is normative for ordinary people to respond to name calling with violence. Additionally, the defendant claims that the Connecticut citizenry is generally peaceable, relying principally upon the state's relatively low incidence of assault for support. In addition, the defendant claims that the fighting words doctrine presents a shifting standard that is ascertained by the "unpredictable" determinations of judges and juries. The state responds that the defendant has failed to sever the connection between abusive language and the likelihood of immediate violence because the statistics she cites do not shed light on the precipitating circumstances of the assaults. Finally, the state claims that the question of whether fighting words actually lead to violent responses is best left to the legislature. I conclude that the fighting words doctrine is consonant with the public policy of the state.

To begin with, abusive language and epithets are not entirely harmless expression. Indeed, there is certain speech that does more than just offend sensibilities or merely cause someone to bristle. One commentator has observed the following about abusive language: "Often a speaker consciously sets out to wound and humiliate a listener. He aims to make the other feel degraded and hated, and chooses words to achieve that effect. In what they accomplish, insults of this sort are a form of psychic assault; they do not differ much from physical assaults, like slaps or pinches, that cause no real physical hurt. Usually, the speaker believes the listener possesses the characteristics that are indicated by his humiliating and wounding remarks, but the speaker selects the most abusive form of expression to impose the maximum hurt. His aim diminishes the expressive importance of the words." (Footnotes omitted.) K. Greenawalt, "Insults and Epithets: Are They Protected Speech?" 42 Rutgers L. Rev. 287, 293 (1990); see also *Taylor* v. *Metzger*, 152 N.J. 490, 503, 706 A.2d 685 (1998) (" 'The experience of being called "nigger," "spic," "Jap," or "kike" is like receiving a slap in the face. The injury is instantaneous.' "). "It is precisely because

fighting words inflict injury that they tend to incite an immediate breach of the peace. Fighting words cause injury through visceral aggression and by attacking the target's rights. Individuals who are injured in this way have a strong tendency to respond on the same level, even though that response may itself be wrongful." (Emphasis omitted; internal quotation marks omitted.) S. Heyman, "Righting the Balance: An Inquiry into the Foundations and Limits of Freedom of Expression," 78 B.U.L. Rev. 1275, 1372 (1998). Indeed, I agree with the Appellate Court's observation that deterring such speech does not limit the freedom of expression, but rather the breach of the peace statute, as limited by the fighting words doctrine, fosters freedom of expression. See *State* v. *Weber*, 6 Conn. App. 407, 416, 505 A.2d 1266 ("[t]he public policy inherent in this statute is not to prevent the free expression of ideas, but to promote a peaceful environment wherein all human endeavors, including the expression of free ideas, may flourish"), cert. denied, 199 Conn. 810, 508 A.2d 771 (1986).

The defendant claims that the law should not embrace an assumption that reasonable people will respond to abusive language with violence and claims that the people of Connecticut are peaceable, citing a low incidence of assault. This argument has received some traction, principally among commentators. See, e.g., B. Caine, "The Trouble with 'Fighting Words,' " 88 Marq. L. Rev. 441, 506 (2004) (noting a lack of evidence to support the "highly dubious assumption" that fighting words lead to violence); see also *State* v. *Read,* supra, 165 Vt. 156 (Morse, J., dissenting) (describing fighting words doctrine as "archaic relic, which found its genesis in more chauvinistic times when it was considered bad form for a man to back down from a fight"). First, as the state points out, the defendant has not severed the connection between abusive language, including epithets, and violence. The assault statistics provided by the defendant shed no light on the precipitating circumstances of the assault cases. In any case, the fighting words doctrine, by requiring the jury to determine whether an *ordinary person* would respond to the abusive language with immediate violence, already contemplates a fluid community standard for fighting words that naturally includes the extent to which the people of this state are peaceable.[34]

Ultimately, I conclude that the fighting words doctrine strikes the appropriate balance. It permits the state to regulate speech that is so abusive and hurtful that it will provoke an immediate violent response, while protecting harsh, but less hurtful speech that has cognizable expressive value. The consequence of limiting the fighting words doctrine to the extent advanced by the defendant would be to protect degrading speech that has the recognized effect of causing palpable impact— enough impact to provoke the listener to immediate violence—in order to preserve, at most, such speech's

practical utility as emotive expression. In other words, fighting words are not constitutionally protected merely because they could be used as a tool to express how strongly a speaker feels about an idea or belief. Accordingly, I find that the public policy factor favors the state's position.

G

In resolving this issue, I conclude that the *Geisler* factors do not support the theory advanced by the defendant. This state's constitution expressly contemplates holding a citizen responsible for the abuse of expressive liberty. See Conn. Const., art. I, § 4. As previously discussed in this concurring and dissenting opinion, this state has historically embraced a civil libertarian philosophy that is permissive of government regulation of the abuse of expressive liberties when such abuse tends toward a breach of the peace. The defendant has not advanced a persuasive theory to adopt a historical exception approach to delineating the scope of expressive liberties. Moreover, while there was no statute criminalizing fighting words at the time the Connecticut constitution was ratified, common law principles embraced punishing such abusive language. The defendant's reliance on Oregon case law is unpersuasive because that state employs a different analytic framework to delineate the scope of expressive rights. Also, federal precedents demonstrate that the fighting words doctrine draws its essence from Connecticut law, further supporting a conclusion that protection in this area is coextensive.[35]

Finally, the public policy factor does not demand additional protection for fighting words. I acknowledge that "[t]he Connecticut constitution is an instrument of progress, it is intended to stand for a great length of time and should not be interpreted too narrowly or too literally so that it fails to have contemporary effectiveness for all of our citizens." *State* v. *Dukes*, 209 Conn. 98, 115, 547 A.2d 10 (1988). This progressive principle surely counsels against an interpretation that seeks to apply the mores and norms of yesteryear to modern constitutional law. To be sure, our society's discourse has become progressively coarser. This does not mean, however, that this state's constitution should be converted into a license to gratuitously inflict psychic injury and push people to their limits. The present case makes this point crystal clear. The defendant testified that she did not believe that her tirade would achieve her original goal of retrieving the money transfer. To the contrary, she explained that she felt hurt by the fact that she was purportedly misled about her ability to retrieve the money transfer and she wanted to hurt Freeman back. Perhaps implicit in her purposely hurtful speech was an emotive expression—the strength of her desire to retrieve her money transfer. Nevertheless, the Connecticut constitution does not demand that citizens should

be forced to bear extreme personal denigration—abuse that pushes a person to the brink of violence—so that others may freely employ wanton vilification as a form of expression.

On the basis of the foregoing, I conclude that, under the state constitution, speech directly challenging the listener to a fight is not a necessary element of the fighting words doctrine. Rather, the standard is whether the speech at issue is so abusive that it would provoke an ordinary person to respond with immediate violence.

I next turn to whether the evidence was sufficient to sustain the defendant's conviction under § 53a-181 (a) (5). I conclude that the cumulative force of the evidence in the present case is sufficient to support such a conviction.[36] The defendant, in a belligerent and angry manner, used harsh and scornful language designed to debase Freeman. She insulted her on the basis of her gender, body composition, and apparent suitability for her position as a manager of the store. She utilized the word "cunt," which is generally recognized as a powerfully offensive term. I cannot say that, as a matter of law, this evidence is insufficient to find that the defendant's speech was so offensive that it would provoke an ordinary person to immediately respond with violence.

IV

CHARGE

Next, I address whether the issue of whether the trial court properly instructed the jury on the elements of the fighting words gloss placed on the abusive language prong of § 53a-181 (a) (5). The state claims that the defendant impliedly waived her instructional impropriety claim by pursuant to *State* v. *Kitchens*, 299 Conn. 447, 10 A.3d 942 (2011). The defendant claims that there is insufficient evidence in the record to support an implied waiver under *Kitchens*. Alternatively, the defendant claims that the trial court's failure to properly instruct the jury on the elements of the fighting words doctrine resulted in manifest injustice necessitating reversal under the plain error doctrine. On the basis of this court's recent decision in *State* v. *McClain*, 324 Conn. 802, 155 A.3d 209 (2017), I agree with the defendant that she is entitled to plain error review and a reversal thereunder. Accordingly, I need not decide whether the defendant impliedly waived review under *Kitchens*.

The record reveals the following additional facts. After the jury departed on the first day of the defendant's two day trial, the judge furnished to counsel a first draft of the jury charge. The draft charge was marked as an exhibit and dated September 11, 2014. The judge discussed with counsel an issue pertaining to the jury instruction on the two counts of threatening on which the defendant was ultimately not convicted. See footnote 4 of this concurring and dissenting opin-

ion. The judge indicated that he had drafted additional language regarding those counts over lunch, read the language into the record, and indicated that he would provide counsel a hard copy of that language the following day. Thereafter, the judge considered a request to charge on the breach of the peace count. Specifically, defense counsel had requested that the jury be instructed that swearing alone is not enough to convict on that count. After a brief colloquy on the issue, the judge stated that his "inclination" was not to give the requested charge and that the "committee charge available online comes at it quite properly . . . ." The judge stated that he was "satisfied that it's sufficient to tell [the jury] what does constitute the crime of breach of the peace." Wrapping up those two issues, the judge stated he had "a pretty good idea of what [his] charge [was going to] consist of." As defense counsel began to raise other issues pertaining to the jury charge, the judge requested that counsel point out any typographical errors in the draft because "[t]he jury [is] getting a copy of this." Defense counsel raised an issue with respect to the instruction on the obscene language prong of § 53a-181 (a) (5). Defense counsel specifically indicated that she was referring to language on page nineteen of the first draft. The judge permitted the jury to be instructed that there was "no evidence of language that meets the legal definition of obscenity . . . ." There was additional discussion regarding the draft instructions and then court adjourned for the day.

The next day, before resuming the presentation of evidence, an off the record supplemental charging conference was held at which a number of the defendant's requests to charge were considered. The defendant's request to charge, a written copy of which was filed with the court that morning, contained citations to the draft charge disseminated the previous day. During the charging conference, the judge discussed with counsel some changes that were made to the first draft and rejected the defendant's requests to charge. The jury instruction relevant to this appeal that was ultimately provided to the jury was precisely the same as it appeared in the first draft. The challenged instruction is as follows: "Language is 'abusive' if it is so coarse and insulting as to create a substantial risk of provoking violence. The state must prove that the defendant's language had a substantial tendency to provoke violent retaliation or other wrongful conduct. The words used must be 'fighting words,' which is speech that has a direct tendency to cause immediate acts of violence or portends violence. Such speech must be of such a nature that it is likely to provoke the average person to retaliation."

As a threshold matter, I address the proper standard of review for this issue. In her opening brief, the defendant seeks review of her unpreserved claim of instructional impropriety pursuant to *State* v. *Golding*, 213

Conn. 233, 239–40, 567 A.2d 823 (1989). The state claims that the defendant cannot satisfy the third prong of *Golding* in light of her trial counsel's implied waiver of the claim pursuant to our holding in *Kitchens*. The defendant requests in her brief, in the alternative to *Golding* review, that this court review her instructional impropriety claim for plain error. This court recently addressed the question whether a *Kitchens* waiver precludes review under the plain error doctrine. *State* v. *McLain*, supra, 324 Conn. 804. This court answered that question in the negative, concluding that a defendant may seek plain error review of unpreserved claims of instructional impropriety. Id. Because I conclude that the defendant is entitled to relief under the plain error doctrine, I need not decide whether the defendant impliedly waived her right to *Golding* review under *Kitchens*.[37]

I begin with a review of the legal principles that govern review of this issue. "[The plain error] doctrine, codified at Practice Book § 60-5, is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved, are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party. [T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . . Implicit in this very demanding standard is the notion . . . that invocation of the plain error doctrine is reserved for occasions requiring the reversal of the judgment under review." (Internal quotation marks omitted.) *State* v. *Sanchez*, 308 Conn. 64, 76–77, 60 A.3d 271 (2013).

Plain error review is effectuated by application of a two prong test. First, a reviewing court "must determine if the error is indeed plain in the sense that it is patent [or] readily discernable on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable. . . . This determination clearly requires a review of the plain error claim presented in light of the record." (Internal quotation marks omitted.) Id., 77. Second, "the reviewing court must examine that error for the grievousness of its consequences in order to determine whether reversal under the plain error doctrine is appropriate. A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice." (Internal quota-

tion marks omitted.) Id. In other words, the defendant is not entitled relief under the plain error doctrine unless she "demonstrates that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice." (Emphasis omitted; internal quotation marks omitted.) Id., 78.

"It is . . . constitutionally axiomatic that the jury be [properly] instructed on the essential elements of a crime charged." (Internal quotation marks omitted.) *State* v. *Johnson*, 316 Conn. 45, 58, 111 A.3d 436 (2015). "The due process clause of the fourteenth amendment [to the United States constitution] protects an accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. . . . Consequently, the failure to instruct a jury on an element of a crime deprives a defendant of the right to have the jury told what crimes he is actually being tried for and what the essential elements of those crimes are." (Internal quotation marks omitted.) *State* v. *Padua*, 273 Conn. 138, 166, 869 A.2d 192 (2005). "A jury instruction is constitutionally adequate if it provides the jurors with a clear understanding of the elements of the crime charged, and . . . afford[s] proper guidance for their determination of whether those elements were present." (Internal quotation marks omitted.) *State* v. *Valinski*, 254 Conn. 107, 120, 756 A.2d 1250 (2000).

The constitutional dimension of the instructional impropriety in the present case is magnified by the fact that a precise articulation of the element of the substantive offense is necessary to satisfy the requirements of the first amendment. In order for the state to properly punish pure speech, such speech must fall within one of a few exceedingly narrow classes of speech. *Gooding* v. *Wilson*, supra, 405 U.S. 521–22 ("[t]he constitutional guarantees of freedom of speech forbid the [s]tates to punish the use of words or language not within narrowly limited classes of speech" [internal quotation marks omitted]) "Even as to such a class, however . . . the line between speech unconditionally guaranteed and speech which may legitimately be regulated, suppressed, or punished is finely drawn . . . ." (Internal quotation marks omitted.) Id., 522. Therefore, it is vital that "[i]n *every case* the power to regulate must be so exercised as not . . . unduly to infringe the protected freedom . . . ." (Citation omitted; emphasis added; internal quotation marks omitted.) Id. Consistent with this principle, the United States Supreme Court has consistently struck down statutes that purported to criminalize speech in excess of first amendment limits. See, e.g., *Houston* v. *Hill*, supra, 482 U.S. 451; *Lewis* v. *New Orleans*, supra, 415 U.S. 130; *Gooding* v. *Wilson*, supra, 522. Properly maintaining a constitutionally adequate boundary between legitimate and illegitimate speech demands the utilization of "sensitive tools . . . ." (Internal quotation marks omitted.)

*Gooding* v. *Wilson*, supra, 528.

In the present case, the necessary tool for constitutional consonance is a simple, yet narrowly drawn definition of fighting words: abusive language likely to provoke an ordinary person, as the recipient of such abusive language, to respond with imminent violence. See id. Indeed, *Gooding* explicitly rejected any construction that diminished the imminence and violence aspects of the standard. Id., 526.[38] Consistent with *Gooding*, the Appellate Court has placed a judicial gloss on § 53a-181 (a) (5) to save the provision from a facial overbreadth attack, concluding that "subdivision (5) proscribes fighting words that tend to induce immediate violence by the person or persons to whom the words are uttered because of their raw effect." *State* v. *Caracoglia*, supra, 78 Conn. App. 110.[39] This authoritative construction of § 53a-181 (a) (5) is succinct, accurate, and comports comfortably with the federal constitutional rule. It is precisely the kind of sensitive tool *Gooding* required to properly punish illegitimate speech. The efficacy of this tool is illusory, however, if it is not implemented in the form of a properly articulated jury instruction. Accordingly, the failure to charge the jury to limit the application of the crime to the constitutional rule deprives the defendant of a fundamental constitutional right. See *State* v. *Anonymous (1978-4)*, 34 Conn. Supp. 689, 695, 389 A.2d 1270 (App. Sess. 1978), overruled on other grounds by *State* v. *Moulton*, 310 Conn. 337, 351–63, 78 A.3d 55 (2013).

Against this backdrop, it is clear that the jury instruction in the present case failed to accurately describe the legal standard for fighting words. The relevant instruction comprises four sentences. While the instruction excels in verbosity, it fails in accuracy. The instruction impermissibly describes the state's burden of proof to be proof of a broader class of speech than that which would provoke an ordinary person, as recipient of the abusive language, to respond with immediate violence. The second sentence begins the instruction on the legal standard that the state must satisfy with respect to this element of the substantive offense. That sentence starts by stating that "[t]he state must prove that the defendant's language had a substantial tendency to provoke violent retaliation . . . ." If the sentence stopped there, it would be redundant of the first sentence, which defines abusive language to be "so coarse . . . as to create a substantial risk of provoking violence." Instead of stopping there, the instruction impermissibly broadens the scope by indicating that the state could prove the element by showing that the speech tended to provoke "other wrongful conduct." The third sentence does not limit the speech to that which provokes an immediate violent response, but broadens it to speech that "portends violence."[40] The final sentence describes that speech as that which merely provokes "retaliation." Moreover, to the extent the instruction even conveys

that the response to the speech must also be violent, it fails to convey that the jury must find that such violence be *imminent*. None of the four sentences that illustrate that standard indicates that a violent response *must* be imminent. The only sentence that does suggest immediacy is the third sentence, but that sentence employs a disjunctive thereby broadening the class of speech.

To a lay juror, the instruction used in the present case describes the legal standard in broad terms. Read together, the jury's instruction was that the state must show, at a minimum, that the defendant's language "portend[ed] violence" and was likely to "provoke the average person to retaliation" in the form of "wrongful conduct." In other words, this instruction apprised the jury that it could find that the state met its burden if an ordinary person would respond to the defendant's speech—which could have portended violence by coupling the insulting language with the raising of her cane—with threats or fighting words, not necessarily violence. Therefore, this description of the legal standard that the state must satisfy clearly broadens the class of speech deemed illegitimate beyond constitutionally permissible bounds.[41]

Next, there is no doubt that this jury instruction was manifestly unjust. The harm in permitting a jury to criminally sanction such an impermissibly broad class of speech is readily apparent. It is inimical to our system of justice to punish speech that a properly instructed jury may well have found to be constitutionally protected. The state claims that the language used by the defendant was so abusive that any instructional impropriety was harmless. I disagree. The standard for fighting words is an objective one; it asks the jury to make a finding with respect to the degree of offensiveness of the speech. As previously discussed in this concurring and dissenting opinion, permitting a properly instructed to jury to assess the offensiveness of the speech accounts for the evolution in normative values and culture. See part III G of this concurring and dissenting opinion. In the present case, the dispositive issue for the jury with respect to this count was principally the degree of offensiveness of the defendant's language; the defendant admitted berating Freeman and did not stridently dispute the testimony of the state's witnesses regarding the precise language she used. The instruction in the present case apprised the jury of a standard that permitted it to consider an impermissibly broad class of speech sufficient to find guilt. The federal constitution—as well as fundamental fairness—demands that a finding with respect to the degree of offensiveness of the speech—i.e., whether the speech would provoke an ordinary person, as the recipient of the abusive language, to respond with immediate violence—be made, in the first instance, by a properly instructed jury. Accordingly, I would reverse the judg-

ment of the trial court and remand the case to that court for a new trial.

In conclusion, I would decline to review whether there was sufficient evidence to sustain the defendant's conviction under the federal fighting words standard because she has failed to adequately brief her sufficiency claim under this standard. Even if I were to reach the issue, however, I would conclude that the test proposed by the majority—that is, a test that evaluates the individual circumstances of the addressee at a granular level—is not appropriate and is contrary to United States Supreme Court precedent regarding the "ordinary person" test. *Gooding* v. *Wilson*, supra, 405 U.S. 528. Moreover, I would reject the defendant's claim that the Connecticut constitution affords greater protections than the first amendment in this context. Finally, I would conclude that the trial court's failure to properly instruct the jury on the elements of the fighting words doctrine necessitates a new trial.

Therefore, I concur with the majority to the extent that it reverses the judgment of the trial court, but would remand the matter for a new trial.

[1] There is some dispute as to what transpired during this phone call. The defendant testified that she was told that she would be able to retrieve her money transfer if she were to arrive prior to 10 p.m. Tara Freeman, an assistant manager at the store with whom the defendant spoke on the phone, testified that she informed the defendant that it would not be possible for the defendant to retrieve her money transfer because the employee with authority to operate the money transfer machine was not present in the store. Freeman further testified that the defendant told her that "she really didn't give a shit" and proceeded to unleash a tirade of profane language upon Freeman during the phone call. It is unclear which version of the phone conversation was credited by the jury because such a factual finding was not necessary for the jury to reach its verdict.

[2] Freeman testified that the defendant raising her cane perhaps "was part of her talking . . . ."

[3] The defendant conceded that she had yelled and cursed at the manager using terms such as "bitch" and "shove it." She testified that she had "probably" used the term "fat fucking bitch" and "might have" said "cunt." She said she "wouldn't doubt" that she had said "fuck you."

[4] The defendant was also charged with two counts of criminal threatening for events that took place after she departed the store. She was acquitted on one of the threatening counts and the state entered a nolle on the remaining threating count after the jury was unable to reach a verdict. At a pretrial hearing, the state clarified that the threatening charges arose out of conduct alleged to have occurred after the defendant walked out of the store. Specifically, the state alleged that the defendant called the store from the parking lot, employed more coarse language and, believing she was speaking to Freeman, told another store employee to come outside where "there was a gun waiting . . . ." With respect to the breach of the peace count pertinent to this appeal, the state confirmed that the conduct giving rise to the count took place solely in the store. Consequently, the facts set forth herein pertain only to the breach of the peace count.

[5] General Statutes § 53a-181 (a) provides in relevant part: "A person is guilty of breach of the peace in the second degree when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person: (1) Engages in fighting or in violent, tumultuous or threatening behavior in a public place; or (2) assaults or strikes another; or (3) threatens to commit any crime against another person or such other person's property; or (4) publicly exhibits, distributes, posts up or advertises any offensive, indecent or abusive matter concerning any person; or (5) in a public place, uses abusive or obscene language or makes an obscene gesture; or (6) creates a public and hazardous or physically offensive condition by any act which such person is not licensed or privileged to do. . . ."

[6] It is not clear if the threat was a threat of violence.

[7] "[T]o avoid invalidation of § 53a-181 (a) (3) on grounds of overbreadth, we adopt, by way of judicial gloss, the conclusion that, when a police officer is the only person upon whose sensibilities the inflammatory language could have played, a conviction can be supported only for [e]xtremely offensive behavior supporting an inference that the actor wished to provoke the policeman to violence." (Internal quotation marks omitted.) *State* v. *DeLoreto*, supra, 265 Conn. 169.

The majority relies on *In re Nickolas S.*, 226 Ariz. 182, 188 P.3d 446 (2011), in support of its position that we should consider the addressee's position of a store manager. In that case, the Arizona Supreme Court held that it was not likely an average teacher would respond to a student's "profane and insulting outburst" with violence. Id., 188. Perhaps a compelling case could be made for adopting a narrower rule with respect to speech directed at teachers by their students. Like police officers, teachers hold a unique role in society. Teachers undergo extensive training and certification in order to serve in their role. See General Statutes § 10-144o et seq. Given such training, certification, and public regulation, society could reasonably expect a teacher to "exemplify a higher level of professionalism . . . ." *In re Nickolas S.*, supra, 188. If a case implicating speech directed at a teacher by a student were to arise, perhaps we would consider a categorical rule like the one we adopted with respect to speech directed at police officers in *DeLoreto*. This question, however, does not arise in the present case.

[8] Violence, of course, occurs on a spectrum. The test is not whether an ordinary person would immediately kill, pummel, or punch the speaker if addressed with fighting words. It is whether an ordinary person would respond with any immediate violence, even a weak slap or grab.

[9] I reject the majority's attempt to distinguish *Szymkiewicz* on the ground that the defendant in that case was convicted under a different section of the breach of peace statute. Nevertheless, the court still analyzed the case under the fighting words doctrine.

[10] It is of no moment that the state addressed whether the evidence was sufficient under the first amendment standard in its brief. *State* v. *Buhl*, supra, 321 Conn. 728–29 ("[a]n appellant cannot, however, rely on the appellee to decipher the issues and explain them [on appeal]").

[11] The defendant seeks review of her unpreserved state constitutional claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). "Under *Golding*, a defendant may prevail on an unpreserved claim only if the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Saturno*, 322 Conn. 80, 89–90, 139 A.3d 629 (2016); see *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015) (modifying third prong of *Golding*). The state concedes that the first and second conditions are met in the present case, but maintains that the defendant cannot prevail because she has failed to prove that a constitutional violation exists. In view of the conclusion reached in part III of this concurring and dissenting opinion, I agree with the state that the defendant has failed to prove that a constitutional violation exists under our state constitution.

[12] I address each factor somewhat out of order to maintain a logical structure to the analysis of this issue in the present case.

[13] This interpretation of § 4 is based upon an understanding of the framers' sentiments during constitutional debates. See *Cologne* v. *Westfarms Associates*, supra, 192 Conn. 63–64 n.9. Specifically, this court noted that, although there were some during debate that "would leave out" that provision "consider[ing] the whole purpose of it answered in the next section," there were others that disagreed. (Internal quotation marks omitted.) Id. Specifically, this court took note of the following point made during debate: "Every citizen has the liberty of speaking and writing his sentiments freely, and it should not be taken away from him; there was a very great distinction between taking away a privilege, and punishing for an abuse of it—to take away the privilege, is to prevent a citizen from speaking or writing his sentiments—it is like appointing censors of the press, who are to revise before publication—but in the other case, every thing may go out, which the citizen chooses to publish, though he shall be liable for what he *does* publish [and that] the [section] was important . . . ." (Emphasis in original;

internal quotation marks omitted.) Id. In so doing, this court also noted that "[a] broader proposal which prohibited the molestation of any person for his opinions on any subject whatsoever was considered at the convention but rejected." Id., 64 n.9.

[14] The defendant claims that fighting words did not fall within the ambit of the extant statutory offenses implicating pure speech at the time of the ratification of the constitution. In her brief, the defendant adumbrates the following closely related statutory offenses: (1) "An Act to prevent the practice of Duelling"; Public Statute Laws of the State of Connecticut (1808) tit. LIII, § 1, p. 241; (2) "An Act against breaking the Peace"; Public Statute Laws of the State of Connecticut (1808) tit. CXXV, § 1, p. 545; and (3) "An Act against profane Swearing and Cursing"; Public Statute Laws of the State of Connecticut (1808) tit. CLVI, § 1, p. 639.

The provision against dueling punished challenging another person to fight with a dangerous weapon. Public Statute Laws of the State of Connecticut (1808) tit. LIII, § 1, p. 241. The provision against profane swearing and cursing proscribed imprecation of future divine vengeance against another person. Public Statute Laws of the State of Connecticut (1808) tit. CLVI, § 1, p. 639; see also *Holcomb* v. *Cornish*, 8 Conn. 375, 380 (1831).

"An Act against breaking the Peace," which the most analogous statute to § 53a-181 (a) (5), made it a crime to "disturb, or break the peace, by tumultuous and offensive carriages, [threatening], traducing, quarrelling, challenging, assaulting, beating, or striking another person . . . ." Public Statute Laws of the State of Connecticut (1808) tit. CXXV, § 1, p. 545. According to the defendant, the dictionary definitions of these key words that comprise the statutory language reveal that only violent conduct or defamation would have been sufficient to make out a violation.

[15] The state notes that the Ludlow Code of 1650 recognized liberties, but only of "[every] man in his place and proportion . . . ." 1 Colonial Records of Connecticut 1636-1665, p. 509. The state also cites Chief Justice Zephaniah Swift's statement with respect to the qualified nature of individual liberty that human nature cannot "bear total servitude, or total liberty." (Emphasis omitted.) 1 Z. Swift, A System of the Laws of the State of Connecticut (1795) p. 31.

[16] Although *Avery* postdates ratification of the constitution by ten years, this court has previously acknowledged that it is appropriate to look to case law in close temporal proximity to 1818 to better understand the original intent of the constitutional framers. *State* v. *Joyner*, 225 Conn. 450, 462, 625 A.2d 791 (1993); see also *State* v. *Lamme*, 216 Conn. 172, 180–81, 579 A.2d 484 (1990) (relying on case from 1837 for guidance).

[17] The preface to volume I of Swift's Digest of 1823 notes that the principles cited therein were "the most important principles of the common law applicable in this [s]tate . . . ." The relevant theory of criminal liability was listed under the heading "of Breach of the Peace" and further classified under the subheading "of Libel." 2 Z. Swift, A Digest of the Laws of the State of Connecticut (1823) pp. 337, 340. Swift does state at the beginning of the subpart on the subject of libel that while "the common law on this subject is in force here," prosecutions for libel had not been brought in the state. Id., p. 340. In *Avery*, this court controverted Swift's observation regarding the lack of libel prosecutions, pointing to prosecutions in 1806 and 1818. *State* v. *Avery*, supra, 7 Conn. 269–70.

[18] In 1865, the General Assembly passed a law making the use of abusive language a statutory offense. Public Acts 1865, Chap. LXXXVI, pp. 80–81. The underlying rationale for the statute was that "in the exercise of a malicious ingenuity one person could insult another, injure his character, wound his feelings, and *provoke him to violence*, in a mode against which there existed no precise and adequate provision of law . . . ." (Emphasis added.) *State* v. *Warner*, 34 Conn. 276, 278–79 (1867).

[19] The defendant is incorrect that, because of the absence of appellate case law discussing the scope of the fighting words doctrine under the Connecticut constitution, this court simply writes on a blank slate, unguided by state appellate precedents. First, the absence of case law on the matter strongly suggests that this factor does not support the defendant's position. See *State* v. *Skok*, 318 Conn. 699, 709, 122 A.3d 608 (2015) ("because Connecticut courts have not yet considered whether article first, § 7, [of the Connecticut constitution] provides greater protection than the federal constitution with respect to recording telephone conversations with only one party's consent, the second *Geisler* factor also does not support the defendant's claim"). Second, in *Trusz* v. *UBS Realty Investors, LLC*, supra, 319 Conn. 195–97, this court looked to appellate precedents not for controlling author-

ity on the precise legal issue at hand; rather, it looked to appellate authority for broader principles that underpin this state's expressive rights jurisprudence to inform the analysis. In *Trusz*, this court looked to *State* v. *Linares*, supra, 232 Conn. 386, for the state constitutional expressive rights principle of favoring flexible, case-by-case analytic frameworks over rigid, categorical tests. See *Trusz* v. *UBS Realty Investors, LLC*, supra, 195. Additionally, this court looked to the Appellate Court decision in *State* v. *DeFusco*, 27 Conn. App. 248, 256, 606 A.2d 1 (1992), aff'd, 224 Conn. 627, 620 A.2d 746 (1993), for the broad proposition that the Connecticut constitution has tended to preserve civil liberty protections previously afforded by the federal constitution, but from which the United States Supreme Court has retreated. See *Trusz* v. *UBS Realty Investors, LLC*, supra, 196–97.

[20] The state also points out that the Appellate Court has incorporated the fighting words doctrine into the expressive rights provisions of the state constitution. See *State* v. *Caracoglia*, supra, 78 Conn. App. 110. In *Caracoglia*, the court held that that § 53a-181 (a) was not facially overbroad under the state constitution. Id., 110–11. In that case, however, the defendant did not appear to advance the theory that the Connecticut constitution afforded broader protection relative to fighting words than the federal constitution. Id. Accordingly, I conclude that case adds little to the analysis of the scope of the fighting words doctrine.

[21] See *Connick* v. *Myers*, supra, 461 U.S. 142 (in determining scope of public employee's right to free speech in workplace, court must seek "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [s]tate, as an employer, in promoting the efficiency of the public services it performs through its employees" [internal quotation marks omitted]); *Pickering* v. *Board of Education*, 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968) (same).

[22] The standard adopted in *Trusz* is, at least arguably, not quite as permissive as the *Connick/Pickering* test. The test adopted in *Trusz* allows an employee to prevail only if "he speaks on a matter of unusual importance and satisfies high standards of responsibility in the way he does it." (Internal quotation marks omitted.) *Trusz* v. *UBS Realty Investors, LLC*, supra, 319 Conn. 204; but see id., 204 n.19 (discussing whether the test adopted was actually a modification of the *Pickering* test).

[23] The statute at issue in *Sinchuk* was entitled "An Act Concerning Sedition," and, on its face, appeared "to penalize three classes of publications: (1) disloyal, scurrilous or abusive matter concerning the form of government of the United States, its military forces, flag or uniform; (2) any matter intended to bring them into contempt; (3) or which creates or fosters opposition to organized government." (Internal quotation marks omitted.) *State* v. *Sinchuk*, supra, 96 Conn. 607.

[24] Indeed, in *Winters* v. *New York*, 333 U.S. 507, 520, 68 S. Ct. 665, 92 L. Ed. 840 (1948), the United States Supreme Court invalidated a New York statute similar to that at issue in *McKee* on the basis of vagueness. The court noted that the statute at issue in *McKee* was determined by this court to be in conformity with state constitutional expressive rights provisions, but that the law was not challenged under the United States constitution. Id., 512. The narrow holdings of *Pape* and *Sinchuk* are likewise dubious in light of *Brandenburg* v. *Ohio*, 395 U.S. 444, 89 S. Ct. 1827, 23 L. Ed. 2d 430 (1969), and *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964).

[25] To the contrary, these cases provide highly relevant insight into the expressive rights principles that animate this state's more modern state constitutional expressive rights jurisprudence. Indeed, in *State* v. *Linares*, supra, 232 Conn. 382, this court favorably cited *State* v. *McKee*, supra, 73 Conn. 28–29, for its insight into the importance of free expression in democratic society.

[26] Article first, § 8, of the Oregon constitution provides: "No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

[27] The defendant cited the fact that in early Vermont "the language of profanity was the common dialect" and that the state reelected an incarcerated congressman who was convicted under the Sedition Act of 1798. (Internal quotation marks omitted.) *State* v. *Read*, supra, 165 Vt. 154.

[28] That statement provided in relevant part as follows: " 'In your . . . resolution you . . . severely reprehend the act of [c]ongress commonly called "the [s]edition bill." If we possessed the power you assumed, to censure the acts of the [g]eneral [g]overnment, we could not consistently

construe the [s]edition bill unconstitutional; because our own constitution guards the freedom of speech and the press in terms as explicit as that of the United States, yet long before the existence of the [f]ederal [c]onstitution, we enacted laws which are still in force against sedition, inflicting severer penalties than this act of [c]ongress. And although the freedom of speech and of the press are declared unalienable in our bill of rights, yet the railer against the civil magistrate, and the blasphemer of his [m]aker, are exposed to grievous punishment. And no one has been heard to complain that these laws infringe our state [c]onstitution.' " (Emphasis omitted.) *State* v. *Read*, supra, 165 Vt. 155.

[29] I discuss *Cantwell* v. *Connecticut*, supra, 310 U.S. 296, under the federal precedent prong because it is an important foundation of the federal fighting words doctrine. Additionally, the defendants in that case did not make a constitutional claim with respect to the relevant charge, they made a sufficiency of the evidence claim. *State* v. *Cantwell*, 126 Conn. 1, 5–6, 8 A.2d 533 (1939), rev'd, 310 U.S. 296, 60 S. Ct. 900, 84 L. Ed. 1213 (1940). Accordingly, with respect to this state's constitutional expressive rights jurisprudence, this case is of little value and does not fit as well with the cases directly implicating state constitutional principles.

[30] The defendants in that case did not challenge the breach of the peace conviction on state constitutional grounds. See footnote 29 of this concurring and dissenting opinion. The absence of even a constitutional argument with respect to that conviction is particularly noteworthy given the fact that, though not relevant to this discussion, the defendants in that case challenged their conviction of solicitation without a permit on state constitutional expressive rights grounds. See *State* v. *Cantwell*, supra, 126 Conn. 4–5.

[31] Specifically, this court found sufficient evidence to support the breach of peace conviction against one of the defendants, Jessie Cantwell. *State* v. *Cantwell*, supra, 126 Conn. 6–8. This conclusion was based on the following facts: "Jesse Cantwell stopped John Ganley and John Cafferty, both of whom are Catholics, and receiv[ed] permission [to play a] phonograph record . . . which attacked that religion and church. On hearing it, Ganley felt like hitting Cantwell and told him to take his bag and victrola and be on his way. If he had remained he might have received physical violence. Cafferty's mental reaction was to put Jesse [Cantwell] off the street and he warned him that he had better get off before something happened to him." *State* v. *Cantwell*, supra, 126 Conn. 6.

[32] The court overturned the breach of peace conviction of the other two defendants because the record revealed only that they had been engaged in simple canvassing. *State* v. *Cantwell*, supra, 126 Conn. 7–8.

[33] The defendant in *Chaplinsky* was convicted under a statute providing as follows: "No person shall address any offensive, derisive or annoying word to any other person who is lawfully in any street or other public place, nor call him by any offensive or derisive name, nor make any noise or exclamation in his presence and hearing with intent to deride, offend or annoy him, or to prevent him from pursuing his lawful business or occupation." (Internal quotation marks omitted.) *Chaplinsky* v. *New Hampshire*, supra, 315 U.S. 569.

[34] Additionally, a defendant is protected from punishment for negligently using fighting words by virtue of the fact that the breach of the peace statute has a scienter requirement.

[35] The defendant has also suggested that the standard should be a more subjective one, looking at the circumstances of the recipient of the abusive language. The United States Supreme Court has observed that the fighting words doctrine may require a narrower scope in cases involving police officers because, in light of their training and experience, they may be expected to exercise a higher degree of restraint. *Houston* v. *Hill*, supra, 482 U.S. 462; *Lewis* v. *New Orleans*, supra, 415 U.S. 135 (Powell, J., concurring); see also Model Penal Code § 250.1, Comment 4 (c) (Tent. Draft No. 13, 1960). Indeed, this court has placed such a judicial gloss on § 53a-181 (a) (3). See *State* v. *DeLoreto*, supra, 265 Conn. 168–69. I conclude that it would not be appropriate to implement a more subjective test. The flaw in such a standard is twofold: (1) it invites the speaker to make value judgments about the proclivity for violence of the individuals involved, and (2) creates corresponding asymmetry in expressive liberty. The first flaw is that it invites the fact finder to make judgments about the circumstances of the individuals involved and the general likelihood that the recipient would respond violently, which invites judgments about the violent tendencies based on traits such as profession, size, age, physical capability, or even gender and race. Second, the asymmetry in expressive liberty is created by virtue of the fact

that abusive language against those less likely to respond violently such as the feeble would be protected, whereas abusive language directed against a strong, chauvinistic person would not be protected. See T. Shea, " 'Don't Bother to Smile When You Call Me That'—Fighting Words and the First Amendment," 63 Ky. L.J. 1, 22 (1975); see also K. Greenawalt, supra, 42 Rutgers L. Rev. 297–98. Additionally, a more subjective inquiry would convert the rule from one predicated on a community standard to one that measures free speech protection by the individualized violent proclivities of the recipient of the abusive language, and the touchstone would be whether the recipient did, in fact, respond with violence.

[36] Even though I would reverse the judgment of the trial court on the basis of instructional impropriety; see part IV of this concurring and dissenting opinion; I "must address a defendant's insufficiency of the evidence claim, if the claim is properly briefed and the record is adequate for the court's review, because resolution of the claim may be dispositive of the case and a retrial may be a wasted endeavor." (Internal quotation marks omitted.) *State* v. *Padua*, 273 Conn. 138, 179, 869 A.2d 192 (2005).

[37] The defendant also urges this court to overrule the implied waiver rule set forth in *Kitchens*, incorporating by reference the arguments of the defendant in *State* v. *Herring*, 323 Conn. 526, 147 A.3d 653 (2016). We recently considered the implied waiver rule's continuing vitality in *State* v. *Bellamy*, 323 Conn. 400, 402–403, 147 A.3d 655 (2016). For the reasons set forth therein, I would reject the defendant's request to overrule *Kitchens*.

[38] The United States Supreme Court concluded that state appellate authority construing the relevant breach of peace statute was unconstitutional where it was construed as follows: "[W]ords of description, indicating the kind or character of opprobrious or abusive language that is penalized, and the use of language of this character is a violation of the statute, even though it be addressed to one who, on account of circumstances or by virtue of the obligations of office, cannot actually then and there resent the same by a breach of the peace . . . .

"Suppose that one, at a safe distance and out of hearing of any other than the person to whom he spoke, addressed such language to one locked in a prison cell or on the opposite bank of an impassable torrent, and hence without power to respond immediately to such verbal insults by physical retaliation, could it be reasonably contended that, because no breach of the peace could then follow, the statute would not be violated? . . .

"[T]hough, on account of circumstances or obligations imposed by office, one may not be able at the time to assault and beat another on account of such language, it might still tend to cause a breach of the peace at some future time, when the person to whom it was addressed might be no longer hampered by physical inability, present conditions, or official position." (Internal quotation marks omitted.) *Gooding* v. *Wilson*, supra, 405 U.S. 526, quoting *Elmore* v. *State*, 15 Ga. App. 461, 461–63, 83 S.E. 799 (1914).

[39] The state does not dispute the contours of the federal fighting words doctrine or the substance of the judicial gloss placed on § 53a-181 (a) (5).

[40] Portend is defined as follows: (1) "to give an omen or anticipatory sign of," and (2) "indicate, signify." Merriam-Webster's Collegiate Dictionary (11th Ed. 2003). In other words, the language could be an anticipatory sign or indicate violence from the speaker or others at any time, but not necessarily an immediate violent response from the recipient of the abusive language.

[41] The instruction also fails to expressly state that the speech must provoke a violent response from the person to whom the abusive language was directed.