******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ECKER, J., concurring. I join the majority opinion because we are bound by United States Supreme Court precedent to apply the fighting words doctrine as currently formulated, and, in my view, the majority reaches the correct result applying that doctrine to the facts of the present case. I write separately lest my silence otherwise be misunderstood as an endorsement of this deeply flawed doctrine.[1] I also wish to draw attention to the looming question that comes into increasingly sharp focus with every decision issued by this court on the topic. That question is whether there may be a more sensible first amendment framework that would better serve to justify the outcome reached today in a manner that fully honors our government's commitment to freedom of speech without, in the process, sacrificing our ability to regulate a narrow category of malicious hate speech—which, for present purposes, may be defined as speech communicated publicly to an addressee, in a face-to-face encounter, using words or images that demean the addressee on the basis of his or her race, color, national origin, ethnicity, religion, gender, sexual orientation, disability, or like trait, under circumstances indicating that the speaker intends thereby to cause the addressee severe psychic pain. I do not know when the United States Supreme Court will acknowledge that the current doctrine is untenable or whether it will consider replacing it with a reformulated doctrine focused on the government's interest in regulating hate speech. Nor do I know whether such a hate speech doctrine ultimately would pass muster under the first amendment. Sooner or later, however, I believe that it will become necessary to either shift doctrinal paradigms or admit failure because it has become evident that the existing fighting words doctrine does not provide a sound or viable means to draw constitutional lines in this area.

I

I agree wholeheartedly with my colleagues that the words and sentiments expressed by the defendant, David B. Liebenguth, were vile, repugnant and morally reprehensible. He selected his words for their cruelty and used them as a weapon to inflict psychic wounds as painful, or more so, than physical ones. The defendant crossed a particular line that should never be crossed by anyone in America and then crossed that line again by engaging in after-the-fact conduct indicating a complete lack of contrition. See footnote 4 of the majority opinion. The views expressed in this concurring opinion should not be construed in any way to excuse, defend, or otherwise condone the defendant's words or accompanying conduct.

This brings me directly to the point. I believe that

we need not scratch too deeply beneath the surface to see that the defendant is being punished criminally for the content of his speech. It is the reprehensible content of the speech that propels our desire to prohibit it. Indeed, one very particular meaning intended by the defendant's language is behind this prosecution. The criminality of the defendant's speech does not inhere in his use of the word "nigger" itself because that word can mean very different things depending on the identity, race, affiliation, and cultural milieu of the speaker and the addressee. See R. Kennedy, "The David C. Baum Lecture: 'Nigger!' as a Problem in the Law," 2001 U. Ill. L. Rev. 935, 937.[2] The criminality of the defendant's speech derives from his use of the word as a term of oppression, contempt, and debasement rather than affection or brotherhood.

Therein lies the difficulty under the first amendment, because the quintessential teaching of the constitutional prohibition against any law abridging the freedom of speech is that the government cannot proscribe speech on the basis of content. "[A]bove all else," Justice Thurgood Marshall famously observed, "the [f]irst [a]mendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept.* v. *Mosley*, 408 U.S. 92, 95, 92 S. Ct. 2286, 33 L. Ed. 2d 212 (1972); accord *Brown* v. *Entertainment Merchants Assn.*, 564 U.S. 786, 790–91, 131 S. Ct. 2729, 180 L. Ed. 2d 708 (2011); *Ashcroft* v. *American Civil Liberties Union*, 535 U.S. 564, 573, 122 S. Ct. 1700, 152 L. Ed. 2d 771 (2002); see *Reed* v. *Gilbert*, 576 U.S. 155, 163, 135 S. Ct. 2218, 192 L. Ed. 2d 236 (2015) ("[c]ontent-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests"); *R. A. V.* v. *St. Paul*, 505 U.S. 377, 382, 112 S. Ct. 2538, 120 L. Ed. 2d 305 (1992) ("[t]he [f]irst [a]mendment generally prevents [the] government from proscribing speech . . . or even expressive conduct . . . because of disapproval of the ideas expressed" (citations omitted)); see also footnote 8 of this opinion. Speech that offends, provokes, or disrupts cannot be censored by the government merely because it roils calm waters or contravenes our collective sense of civilized discourse. Although the content of such speech at times may be extremely difficult to tolerate, and its value may be impossible to discern, we must never forget that "a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not

absolute . . . is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest. . . . There is no room under our [c]onstitution for a more restrictive view. For the alternative would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups." (Citations omitted.) *Terminiello* v. *Chicago*, 337 U.S. 1, 4–5, 69 S. Ct. 894, 93 L. Ed. 1131 (1949).

The fighting words doctrine is among the very few exceptions to this rule. "[T]he [f]irst [a]mendment has 'permitted restrictions upon the content of speech in a few limited areas' " consisting of " 'historic and traditional categories long familiar to the bar' . . . including obscenity . . . defamation . . . fraud . . . incitement . . . and speech integral to criminal conduct . . . ." (Citations omitted.) *United States* v. *Stevens*, 559 U.S. 460, 468, 130 S. Ct. 1577, 176 L. Ed. 2d 435 (2010); see also *R. A. V.* v. *St. Paul*, supra, 505 U.S. 383, 386 (listing exceptions, including fighting words). The fighting words doctrine, in modified form, appears to remain good law despite widespread criticism and a distinctly underwhelming track record in its place of origin, the United States Supreme Court.[3] See *State* v. *Parnoff*, 329 Conn. 386, 411, 186 A.3d 640 (2018) (*Kahn, J.*, concurring in the judgment) ("[t]he continuing vitality of the fighting words exception is dubious and the successful invocation of that exception is so rare that it is practically extinct").

I understand that we must adhere to the fighting words doctrine until the United States Supreme Court says otherwise. But, although the majority opinion does an admirable job fashioning a silk purse out of this particular sow's ear, I believe that we are better off in the end expressing our concerns openly and displaying a more determined preference for avoiding further entanglement with this untenable doctrine.[4] In my view, this court's own engagement with the fighting words doctrine to date has resulted in a series of decisions embedding us more deeply in the doctrinal quicksand each time we undertake the futile task of drawing constitutional distinctions between one person's lyric and another's vulgarity.[5] I fear that the doctrine we have embraced disserves us more than we acknowledge by inducing us to believe, or act as if we believe, that we are able to discern a constitutional line distinguishing one angry person screaming a race-based epithet at a municipal parking enforcement officer from another angry person screaming a gender-based epithet at a store manager. See *State* v. *Baccala*, 326 Conn. 232, 235–36, 256, 163 A.3d 1 (calling assistant manager of grocery store "a 'fat ugly bitch' and a 'cunt' " did not constitute fighting words and, therefore, warranted constitutional protection under first amendment), cert. denied, U.S. , 138 S. Ct. 510, 199 L. Ed. 2d

## II

The profound and intractable problems inherent in the fighting words doctrine become evident the moment we examine the legal standard that our court uses to determine whether a defendant's speech falls within its scope. The majority correctly describes the analysis. Fighting words is speech that is "likely to provoke a violent response under the circumstances in which [the words] were uttered . . . ." Id., 234. The doctrine purports not to be concerned with the content of the speech per se but, rather, the "likelihood of violent retaliation." Id., 240. Thus, unlike the situation described by George Carlin in his classic comedic monologue about government censorship of obscene language, "Seven Words You Can Never Say on Television,"[6] there is no predetermined list of proscribed fighting words or phrases; context is everything. As the majority aptly observes, "there are no per se fighting words because words that are likely to provoke an immediate, violent response when uttered under one set of circumstances may not be likely to trigger such a response when spoken in the context of a different factual scenario." In determining whether the speech in any particular circumstance is constitutionally protected, the person performing the constitutional line drawing must consider "a host of factors," including not only the words themselves, but "the manner and circumstances in which the words were spoken" and "those personal attributes of the speaker and addressee that are reasonably apparent . . . ." *State* v. *Baccala*, supra, 326 Conn. 240–41; see id., 242–43 ("[c]ourts have . . . considered the age, gender, race, and status of the speaker" and "also have taken into account the addressee's age, gender, and race"). This intensely contextualized and fact specific inquiry strives to remain "objective" in nature. Id., 247. For this reason, the issue is not how the actual addressee in fact responds to the speech, but the likely response of the *average* person in the addressee's shoes. Id.; see *Chaplinsky* v. *New Hampshire*, 315 U.S. 568, 573, 62 S. Ct. 766, 86 L. Ed. 1031 (1942) ("the test [for determining which words are fighting words] is what men of common intelligence would understand would be words likely to cause an average addressee to fight" (internal quotation marks omitted)).

As this description illustrates, the constitutional justification for the fighting words doctrine, as it operates today, does *not* rest on the state's interest in protecting the addressee from the emotional and psychic harm caused by words "which by their very utterance inflict injury . . . ."[7] *Chaplinsky* v. *New Hampshire*, supra, 315 U.S. 572. Instead, the current fighting words doctrine purports to regulate speech on the basis of its *incitement effect*, i.e., the likelihood of inciting the addressee to immediate violence against the speaker.

The ascendancy of the incitement rationale as the sole constitutionally legitimate justification for the fighting words doctrine avoids the appearance, discomfiting to some, that the state is censoring speech due solely to the emotional impact that the content of that speech has on the addressee.[8] The allure of the incitement analysis, in other words, lies in its insistence that it is entirely unconcerned with the *content* of the speech under review and regulates solely on the basis of the "nonspeech" element of the communication. See *R. A. V.* v. *St. Paul*, supra, 505 U.S. 386.

Serious problems arise, however, when we use the fighting words exception to regulate offensive speech under the rubric of the incitement rationale. Fighting words is an unusual subcategory of incitement speech—the speaker and listener are adversaries rather than coconspirators, and the speaker ordinarily is not *advocating* violence but, rather, speaking words in a manner likely to stimulate the listener's anger to the boiling point.[9] The fighting words doctrine permits the government to prohibit speech that the government deems likely to incite a physical attack by the addressee *on the speaker himself*. Put another way, this category of speech loses its constitutional protection because it is deemed likely to "cause" another person to punch the speaker in the nose (or worse)—a distinctly counterintuitive justification for withdrawing constitutional protection from the speaker. See *Feiner* v. *New York*, 340 U.S. 315, 327 n.9, 71 S. Ct. 303, 95 L. Ed. 295 (1951) (Black, J., dissenting) ("[T]he threat of one person to assault a speaker does not justify suppression of the speech. There are obvious available alternative methods of preserving public order. One of these is to arrest the person who threatens an assault."); B. Caine, "The Trouble with 'Fighting Words': *Chaplinsky* v. *New Hampshire* Is a Threat to First Amendment Values and Should Be Overruled," 88 Marq. L. Rev. 441, 507 (2004) ("[p]unishing the speaker for the violence committed against the speaker is totally at odds with [first amendment principles]"); R. Kennedy, supra, 2001 U. Ill. L. Rev. 942 ("Rather than insisting that the target of the speech control himself, the doctrine tells the offensive speaker to shut up. This is odd and objectionable.").

I wish to focus on two of the most fundamental problems that infect the doctrine as it has been applied in Connecticut. First, as Justice Kahn observes in her concurring opinion, one of the foremost flaws inherent in the fighting words doctrine is that its application turns on the adjudicator's assessment of the addressee's physical ability and psychological or emotional proclivity to respond with violence to the speaker's insulting words. The majority's description of the required legal analysis frankly acknowledges its focus on the speaker's and the addressee's respective age, race, gender, physical condition, and similar characteristics. The doctrine thus confers or withdraws constitutional protec-

tion depending on the demographic characteristics of the relevant individuals; vicious and vile words spoken by "a child, a frail elderly person, or a seriously disabled person" may be protected under the first amendment because "social conventions . . . [or] special legal protections . . . could temper the likelihood of a violent response . . . ." *State* v. *Baccala*, supra, 326 Conn. 242. And most important, as the majority, quoting *State* v. *Baccala*, supra, 249, acknowledges, " 'an unfortunate but necessary' " part of the constitutional analysis is an assessment of the *addressee's* physical abilities and aggressive tendencies to determine whether the addressee is " 'likely to respond violently . . . .' "

"Unfortunate" is a vast understatement. The fighting words doctrine invites—even requires—stereotyping on the basis of age, gender, race, and whatever other demographic characteristics the adjudicator explicitly or implicitly relies on to decide whether a person is likely to respond to offensive language with immediate violence. In my view, a bright red light should flash when our first amendment doctrine leads us to conclude, for example, that an outrageous slur directed at a physically disabled elderly woman is constitutionally protected but the identical words addressed to a physically fit man walking down the sidewalk will subject the speaker to criminal prosecution. It is no wonder that the fighting words doctrine is considered by many critics to represent a "hopeless anachronism that mimics the macho code of barroom brawls." K. Sullivan, "The First Amendment Wars," New Republic, September 28, 1992, p. 40; id. (observing that fighting words doctrine "give[s] more license to insult Mother Teresa than Sean Penn just because she is not likely to throw a punch"); see A. Carr, "Anger, Gender, Race, and the Limits of Free Speech Protection," 31 Hastings Women's L.J. 211, 227 (2020) (describing *Chaplinsky* as reflecting "a gendered . . . perspective" enshrining "a 'hypermasculine' exemption from presumed 'gentlemanly' expectations of conduct among men"); S. Gard, "Fighting Words as Free Speech," 58 Wash. U. L.Q. 531, 536 (1980) (opining that fighting words doctrine represents "a quaint remnant of an earlier morality that has no place in a democratic society"); K. Greenawalt, "Insults and Epithets: Are They Protected Speech?," 42 Rutgers L. Rev. 287, 293 (1990) ("Many speakers who want to humiliate and wound would also welcome a fight. But in many of the cruelest instances in which abusive words are used, no fight is contemplated: white adults shout epithets at black children walking to an integrated school; strong men insult much smaller women."); R. Kennedy, supra, 2001 U. Ill. L. Rev. 943 (fighting words doctrine "gives more leeway to insult a nun than a prizefighter because she is less likely to retaliate"); W. Reilly, "Fighting the Fighting Words Standard: A Call for Its Destruction," 52 Rutgers L. Rev. 947, 956 (2000) (observing that fighting words doctrine

permits "speech to be [regulated] . . . when directed at someone who would react violently to a verbal assault, but [prohibits regulation] . . . when directed at someone with a more pacific bent").[10]

The doctrine in no way avoids this analytical abyss by focusing its inquiry on the personal characteristics of the "average" addressee rather than the actual listener. To the contrary, styling the test in faux objective garb only makes things worse because there is no empirical basis for such an inquiry; no such average person exists, no metric for assessment exists, and, to the best of my knowledge, nothing that we would consider valid social science is available to assist the decision maker. The first amendment becomes a Rorschach blot onto which the adjudicating authority (and, before it reaches the adjudicator, the arresting officer and state prosecutor) projects his or her own stereotypes, preconceptions, biases and fantasies about race, ethnicity, sexual orientation, gender, religion, and other "identity" characteristics of the addressee to decide whether a person with those demographics probably would react with immediate violence.[11] This is especially the case when it comes to the predominant twenty-first century brand of insults, epithets, and slurs, which so often target the group identity of the addressee. The fighting words doctrine in its current form confers or withdraws first amendment protection on the basis of nothing more substantial than our own stereotypes and biases regarding those very demographic features. This is "I know it when I see it" run amuck.[12]

The sharp contrast between this court's holdings in *Baccala* and the present case demonstrate the point. The majority does its best to distinguish *Baccala* on some basis other than gender and race, but the stark reality of differential treatment remains.[13] In my view, the various distinctions drawn between that case and the present case, though unquestionably reflecting the good-faith assessment of the subscribing justices, reinforce rather than remove valid concerns regarding the arbitrary, subjective, and gendered nature of the fighting words doctrine. An observer would be excused for thinking that these outcomes reflect, and may tend to perpetuate, nothing more substantial than our deeply ingrained stereotypes regarding the traditional gender traits of the "average" woman, at least the "average" white woman. See footnote 11 of this opinion.[14]

The potential for discriminatory enforcement, or at the very least the perception that a "realistic possibility that official suppression of ideas is afoot," is anathema to our most fundamental first amendment values. *R. A. V. v. St. Paul*, supra, 505 U.S. 390. In the hands of even the most responsible police officers, prosecutors, judges and juries, this legal standard is sure to produce incongruous and inexplicable results, even if all participants—including the speaker and the addressee—share

a relatively homogenous set of cultural norms and expectations. Under the auspices of less enlightened administrating authorities, the doctrine, in my view, "contains an obvious invitation to discriminatory enforcement . . . ." (Internal quotation marks omitted.) *Houston* v. *Hill*, 482 U.S. 451, 465 n.15, 107 S. Ct. 2502, 96 L. Ed. 2d 398 (1987). The wide degree of subjectivity necessitated by the legal standard "furnishes a convenient tool for 'harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure' "; *Papachristou* v. *Jacksonville*, 405 U.S. 156, 170, 92 S. Ct. 839, 31 L. Ed. 2d 110 (1972), quoting *Thornhill* v. *Alabama*, 310 U.S. 88, 97–98, 60 S. Ct. 736, 84 L. Ed. 1093 (1940); and "confers on [the] police a virtually unrestrained power to arrest and charge persons with a violation." *Lewis* v. *New Orleans*, 415 U.S. 130, 135, 94 S. Ct. 970, 39 L. Ed. 2d 214 (1974) (Powell, J., concurring in the result).

This brings me to the second fundamental problem with the fighting words doctrine, which is that such an intensely contextualized, fact specific, and inherently subjective analysis in the area of free speech creates major constitutional concerns under due process vagueness principles. The underlying vice addressed by the void for vagueness doctrine is basic to the rule of law: "As generally stated, the [void for vagueness] doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. . . . Although the doctrine focuses both on actual notice to citizens and arbitrary enforcement, [the court has] recognized recently that the more important aspect of the vagueness doctrine 'is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement.' . . . Where the legislature fails to provide such minimal guidelines, a criminal statute may permit 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.' " (Citations omitted.) *Kolender* v. *Lawson*, 461 U.S. 352, 357–58, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983); see also *Grayned* v. *Rockford*, 408 U.S. 104, 108–109, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972) ("It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for

those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, [when] a vague statute abut[s] upon sensitive areas of basic [f]irst [a]mendment freedoms, it operates to inhibit the exercise of [those] freedoms. Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked." (Footnotes omitted; internal quotation marks omitted.)).

The defendant in the present case has not challenged General Statutes § 53a-181 (a) (5) on vagueness grounds, and, accordingly, it is not necessary or appropriate at this time to decide whether the statute is saved by this court's narrowing construction, which limits its coverage to fighting words as we have defined that term in the prescribed analysis.[15] In my opinion, our recent decisions, including the decision issued today, have not made that future task any easier.

To summarize, the facts of the present case obscure the mischief inherent in the fighting words doctrine, as applied by this court. I feel confident that every judge in Connecticut would agree without reservation that the particular words spoken by the defendant occupy a singular category of offensive content as a result of our country's history. They are unique in their brutality. I therefore agree fully with the view expressed by Judge Devlin that "angrily calling an African-American man a 'fucking [nigger]' after taunting him with references to a recent police shooting of a young African-American man by a white police officer" must fall within the scope of the fighting words doctrine. *State* v. *Liebenguth*, 181 Conn. App. 37, 68, 186 A.3d 39 (2018) (*Devlin, J.*, concurring in part and dissenting in part). But, for the reasons set forth in this concurring opinion, I also believe that the fighting words doctrine does not provide a sensible way to determine the circumstances under which the government may prosecute the utterance of such vile and repugnant speech.

### III

This court's own recent experience applying the fighting words doctrine, as well as the many similar cases adjudicated by state courts around the country, powerfully illustrates why the United States Supreme Court should consider fashioning a more defensible and administrable first amendment framework for deciding when the government may criminalize the kind of hate speech uttered by the defendant in the present case. To best serve its purpose, the reformulated doctrine should directly confront the fundamental constitutional issue underlying many of these cases, which is whether and under what circumstances the first amendment permits the government to protect its citizenry from

the kind of psychic and emotional harm that results when a speaker with malicious intent subjects another person to outrageously degrading slurs in a personal, face-to-face encounter. I cannot predict the outcome of such a doctrinal reexamination, but, in my view, it would benefit us all if the Supreme Court undertakes the challenge before too long. Our current doctrine, operating by indirection and proxy through a hypothetical, stereotype-driven assessment of the likelihood that the words will incite violence, is as unworthy as it is unworkable, and every new case decided under its purview creates additional cause for concern.

In the meantime, I agree with the majority that, under our current first amendment case law, if anything is fighting words, then the words spoken by this defendant under these factual circumstances fit the bill. I concur in the majority opinion for this reason.

[1] As will become clear, my concerns share a great deal in common with those expressed by Justice Kahn in her incisive concurring opinion.

[2] Professor Randall L. Kennedy, the author of the acclaimed 2002 book entitled "Nigger: The Strange Career of a Troublesome Word," writes with great learning, sensitivity and sophistication on the subject. He explains the "remarkably protean" nature of the word: "It can mean many things. . . . A weapon of racist oppression, 'nigger' can also be a weapon of antiracist resistance as in Dick Gregory's autobiography entitled Nigger, or H. Rap Brown's polemic Die Nigger Die! An expression of deadening contempt, use of the N-word can also be an assertion of enlivened wit as in Richard Pryor's trenchant album of stand up comedy That Nigger's Crazy. A term of belittlement, 'nigger' can also be a term of respect as in 'James Brown is sho nuff nigger.' . . . A term of hostility, nigger can also be a term of endearment as in 'this is my main nigger'—i.e., my best friend. . . . It might just be, as [the journalist Jarvis Deberry] writes, 'the most versatile and most widely applied intensifier in the English language.' " (Footnotes omitted.) R. Kennedy, supra, 2001 U. Ill. L. Rev. 937; see also A. Perdue & G. Parks, "The Nth Decree: Examining Intraracial Use of the N-Word in Employment Discrimination Cases," 64 DePaul L. Rev. 65, 66 (2014) ("[w]hile some members of the black community . . . publicly embrace [the] use of the N-word by and among blacks as a term of endearment, others . . . still view it exclusively as a tool of racial oppression"). The indomitable Charles Barkley has revealed the politically subversive undercurrent that accompanies some uses of the word: "I use the N-word. I'm going to continue to use the N-word . . . . [W]hat I do with my black friends is not up to white America . . . ." (Internal quotation marks omitted.) A. Perdue & G. Parks, supra, 65–66.

[3] Questions arise about the continued vitality of the fighting words doctrine because the United States Supreme Court has not upheld a single criminal conviction under the doctrine since Chaplinsky was decided almost eighty years ago. Note, "The Demise of the Chaplinsky Fighting Words Doctrine: An Argument for Its Interment," 106 Harv. L. Rev. 1129, 1129 (1993). There is no doubt that the doctrine's scope has been narrowed by a series of decisions including, but not by any means limited to, Cohen v. California, 403 U.S. 15, 20, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971) (limiting fighting words to personally abusive epithets spoken in direct and personal confrontation), Lewis v. New Orleans, 415 U.S. 130, 135, 94 S. Ct. 970, 39 L. Ed. 2d 214 (1974) (Powell, J., concurring in the result) (indicating that first amendment protection is broader when addressee is police officer, who "may reasonably be expected to exercise a higher degree of restraint than the average citizen, and thus be less likely to respond belligerently to fighting words" (internal quotation marks omitted)), and R. A. V. v. St. Paul, supra, 505 U.S. 386, 391 (recognizing that fighting words are not devoid of expressive value, describing fighting words doctrine as regulation of " 'nonspeech' element of communication," and holding that statute prohibiting particular fighting words was unconstitutional because it discriminated on basis of viewpoint of speaker). See, e.g., W. Nevin, " 'Fighting Slurs': Contemporary Fighting Words and the Question of Criminally Punishable Racial Epithets," 14 First Amendment L. Rev. 127, 133–38 (2015) (reviewing post-Chaplinsky cases

limiting fighting words doctrine); T. Place, "Offensive Speech and the Pennsylvania Disorderly Conduct Statute," 12 Temp. Pol. & Civ. Rts. L. Rev. 47, 51–59 (2002) (same); R. Smolla, "Words 'Which By Their Very Utterance Inflict Injury': The Evolving Treatment of Inherently Dangerous Speech in Free Speech Law and Theory," 36 Pepp. L. Rev. 317, 350 (2009) (noting that "the entire mainstream body of modern [f]irst [a]mendment law . . . has dramatically tightened the rules of immediacy, intent, and likelihood of harm required to justify restrictions on speech on the theory the speech will lead to violence" and suggesting that "the 'inflict[s] injury' prong of *Chaplinksy*" is no longer operative and what remains is "that part of *Chaplinksy* linked to genuine 'fighting words' and the maintenance of physical (as opposed to moral) order"). I nonetheless agree with the majority and Justice Kahn that the fighting words exception to the first amendment has not been overruled and remains binding on this court.

[4] I do not break any new ground in pointing out these defects. See, e.g., B. Caine, "The Trouble With 'Fighting Words': *Chaplinsky* v. *New Hampshire* Is a Threat to First Amendment Values and Should Be Overruled," 88 Marq. L. Rev. 441, 444–45 n.6 (2004) ("While I agree with both scholars and others that *Chaplinsky* ought to be overruled, I must note that the [United States] Supreme Court has paid little attention to their plea. . . . [*Chaplinsky*] is so deeply flawed that it cannot stand, and . . . [it] is an intolerable blot on free speech jurisprudence."); S. Gard, "Fighting Words as Free Speech," 58 Wash. U. L.Q. 531, 536 (1980) ("the fighting words doctrine is nothing more than a quaint remnant of an earlier morality that has no place in a democratic society dedicated to the principle of free expression"); R. O'Neil, "Hate Speech, Fighting Words, and Beyond—Why American Law Is Unique," 76 Alb. L. Rev. 467, 471–72 (2012–2013) ("[The] dismissive . . . view of expression [in *Chaplinsky*] that was both unquestionably offensive and provocative now seems not only archaic but also wholly illogical. . . . Seventy years later, *Chaplinsky* remains a persistent source of constitutional confusion. It might have been mercifully overruled long since, but that never happened." (Footnotes omitted.)); W. Reilly, "Fighting the Fighting Words Standard: A Call for Its Destruction," 52 Rutgers L. Rev. 947, 948 (2000) ("The [fighting words doctrine] is discriminatory because its application depends on assumptions about how likely a listener is to respond violently to speech. This approach invites judges or juries to determine whether speech is protected by the [f]irst [a]mendment based on their own prejudices about the listener."); M. Mannheimer, Note, "The Fighting Words Doctrine," 93 Colum. L. Rev. 1527, 1558, 1568–71 (1993) (arguing for modification of fighting words doctrine to add scienter requirement); Note, "The Demise of the *Chaplinsky* Fighting Words Doctrine: An Argument for Its Interment," 106 Harv. L. Rev. 1129, 1141 (1993) ("Overruling *Chaplinsky* would eliminate a doctrine that accommodates the undesirable 'male' tendency to come to blows. More [important], eliminating the 'fighting words' doctrine would eradicate a tool that governmental officials may use and have used to harass minority groups and to suppress dissident speech.").

[5] See *Cohen* v. *California*, 403 U.S. 15, 25, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971) (recognizing that, under fighting words doctrine, "it is . . . often true that one man's vulgarity is another's lyric").

[6] G. Carlin, Class Clown (Little David Records 1972).

[7] *Chaplinsky* defined fighting words as "those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Chaplinsky* v. *New Hampshire*, supra, 315 U.S. 572. The two parts of this definition have come to be known as the "inflicts injury" prong and the "breach of peace" or "incitement" prong. It is debatable whether the "inflicts injury" prong was ever anything more than dictum. See Note, "The Demise of the *Chaplinsky* Fighting Words Doctrine: An Argument for Its Interment," 106 Harv. L. Rev. 1129, 1129 (1993) (noting that "the prong of *Chaplinsky* that exempted words 'which by their very utterance inflict injury'—dictum in that opinion—has never been used by the [c]ourt to uphold a speaker's conviction"). In any event, it is generally acknowledged that the "inflicts injury" prong no longer serves to justify the fighting words exception. See, e.g., *Purtell* v. *Mason*, 527 F.3d 615, 624 (7th Cir.) ("[a]lthough the 'inflict-injury' alternative in *Chaplinsky*'s definition of fighting words has never been expressly overruled, the [United States] Supreme Court has never held that the government may, consistent with the [f]irst [a]mendment, regulate or punish speech that causes emotional injury but does not have a tendency to provoke an immediate breach of the peace" (emphasis omitted)), cert. denied, 555 U.S. 945, 129 S. Ct. 411, 172 L. Ed. 2d 288 (2008); *Boyle* v. *Evanchick*, United States District Court, Docket No. 19-3270 (GAM) (E.D.

Pa. March 19, 2020) (noting "[t]he [United States] Supreme Court's retreat from the broad standard announced in *Chaplinsky*" and abandonment of the "inflicts injury" prong); *UWM Post, Inc.* v. *Board of Regents*, 774 F. Supp. 1163, 1170 (E.D. Wis. 1991) ("[s]ince *Chaplinsky*, the [United States] Supreme Court has . . . limited the fighting words definition so that it now . . . includes [only the 'incitement' prong]"); *People in the Interest of R.C.*, 411 P.3d 1105, 1108 (Colo. App. 2016) ("soon after *Chaplinsky*, the [United States] Supreme Court either dropped the 'inflict[s] injury' category of fighting words altogether or recited the full definition of fighting words without further reference to any distinction between merely hurtful speech and speech that tends to provoke an immediate breach of the peace"), cert. denied, Colorado Supreme Court, Docket No. 16SC987 (November 20, 2017); *State* v. *Drahota*, 280 Neb. 627, 634, 788 N.W.2d 796 (2010) ("the [United States] Supreme Court has largely abandoned *Chaplinsky*'s 'inflict[s] injury' standard"); E. Chemerinsky, Constitutional Law (5th Ed. 2017) § 9 (C) (2) (a), p. 1387 ("the [c]ourt has narrowed the scope of the fighting words doctrine by ruling that it applies only to speech directed at another person that is likely to produce a violent response"); M. Rutzick, "Offensive Language and the Evolution of First Amendment Protection," 9 Harv. C.R.-C.L. L. Rev. 1, 22–27 (1974) (tracing United States Supreme Court's rejection of "inflicts injury" prong in decades since *Chaplinsky*); M. Mannheimer, Note, "The Fighting Words Doctrine," 93 Colum. L. Rev. 1527, 1538–49 (1993) (tracing United States Supreme Court's rejection of "inflicts injury" prong in decades since *Chaplinsky*); Note, supra, 106 Harv. L. Rev. 1137 ("this prong almost certainly has been de facto overruled").

[8] First amendment jurisprudence traditionally recognizes that the government may not censor speech merely because the content or message is insulting or offensive due to its emotional impact on the audience. See, e.g., *Texas* v. *Johnson*, 491 U.S. 397, 414, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989) ("[i]f there is a bedrock principle underlying the [f]irst [a]mendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable"); *Cohen* v. *California*, 403 U.S. 15, 25, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971) ("Surely the [s]tate has no right to cleanse public debate to the point where it is grammatically palatable to the most squeamish among us. . . . [I]t is . . . often true that one man's vulgarity is another's lyric."); cf. R. Kennedy, supra, 2001 U. Ill. L. Rev. 943 ("[t]he [fighting words] doctrine is in tension with the dominant (and good) rule in criminal law that prevents 'mere words standing alone . . . no matter how insulting, offensive, and abusive' from constituting the predicate for a provocation excuse"), quoting *United States* v. *Alexander*, 471 F.2d 923, 941 n.48 (D.C. Cir.), cert. denied sub nom. *Murdock* v. *United States*, 409 U.S. 1044, 93 S. Ct. 541, 34 L. Ed. 2d 494 (1972).

[9] The incitement analysis has its origins in cases in which a speaker faces criminal prosecution or civil liability for advocating unlawful conduct. See, e.g., *Brandenburg* v. *Ohio*, 395 U.S. 444, 444–45, 89 S. Ct. 1827, 23 L. Ed. 2d 430 (1969) (speech allegedly advocating hate group to engage in racial violence); *Schenck* v. *United States*, 249 U.S. 47, 48–50, 39 S. Ct. 247, 63 L. Ed. 470 (1919) (speech advocating reader to resist military conscription); cf. *NAACP* v. *Claiborne Hardware Co.*, 458 U.S. 886, 927, 102 S. Ct. 3409, 73 L. Ed. 2d 1215 (1982) (applying *Brandenburg* test to speech allegedly inciting group to cause property damage). Under the *Brandenburg* "incitement" analysis, speech loses its constitutional protection only if it is (1) "directed to inciting or producing imminent lawless action," *and* (2) "likely to incite or produce such action." *Brandenburg* v. *Ohio*, supra, 447. The fighting words doctrine, unlike the *Brandenburg* incitement analysis, contains no intent requirement. See C. Calvert, "First Amendment Envelope Pushers: Revisiting the Incitement-to-Violence Test with Messrs. Brandenburg, Trump, & Spencer," 51 Conn. L. Rev. 117, 131–32 (2019) ("[i]n contrast to *Brandenburg*, the [c]ourt's test for another unprotected category of speech related to violence—fighting words—lacks an intent element"); M. Mannheimer, Note, "The Fighting Words Doctrine," 93 Colum. L. Rev. 1527, 1557 (1993) (observing that fighting words doctrine does not contain "a true incitement requirement because [it] fail[s] to require a critical component of the *Brandenburg* incitement standard—the intent of the speaker to cause violence").

[10] Professor Kathleen Sullivan is correct to label the doctrine gendered and anachronistic, although its historical roots trace back to the nineteenth century gentlemanly ritual of the duel rather than the timeless working-class custom of barroom brawling. Ironically, as Professor Jeffrey Rosen has observed, "[t]he [social] foundation of the [fighting words] doctrine had

collapsed long before the [United States] Supreme Court enshrined it as marginal constitutional law in 1942 [in *Chaplinksy*]." J. Rosen, "Fighting Words," Legal Affairs, May/June, 2002, p. 18. "Legal bans on fighting words," explains Rosen, "grew out of the [nineteenth century] efforts to discourage the practice of dueling, and they evolved from a [class-based] culture of honor and hierarchy" that we would no longer recognize in contemporary America. Id., p. 16. The concept of fighting words emanates from a "highly ritualized code of honor [that] led American gentlemen in the [nineteenth] century to fight duels, to prove their social status and worthiness for leadership. . . . [D]ueling depended on a strong consensus about the social pecking order. If you were insulted by a social equal, you redeemed your honor by challenging him to a duel. If you wanted to insult a social inferior, you displayed your contempt by bludgeoning him with a cane. In a culture based on honor, there was broad agreement about what kinds of insults could be avenged only by demanding satisfaction in a duel." Id. States attempted—apparently with little success—to put an end to this cultural artifact by enacting laws criminalizing the utterance of words considered so insulting as to necessitate a violent response. Id.; see also K. Greenberg, Honor and Slavery (Princeton University Press 1996) c. 1, pp. 14–15 (discussing history of antidueling laws); J. Freeman, Affairs of Honor (Yale University Press 2001) c. 4, pp. 159–198 (discussing social meaning and national importance of dueling in America during early nineteenth century). Professor Freeman's discussion in particular demonstrates that participation in these "affairs of honor" was not considered optional. See J. Freeman, supra, pp. 159–164 (discussing Alexander Hamilton's tormented desire to avoid proceeding with duel demanded by Aaron Burr and Hamilton's reluctant conclusion that duel was impossible to avoid). "The laws of honor," writes Professor Freeman, "indicated when insults could not be ignored . . . ." Id., p. 171. Our country's dominant social code no longer compels us to defend our honor with violence; to the contrary, it is considered honorable to respond to insults by walking away, as the parking enforcement officer, Michael McCargo, did in the present case.

[11] There is a substantial body of social science literature on implicit bias, which is generally defined as subconscious "stereotypes and prejudices that can negatively and nonconsciously affect behavior . . . ." L. Richardson, "Arrest Efficiency and the Fourth Amendment," 95 Minn. L. Rev. 2035, 2039 (2011). One such implicit bias "consists of the cultural stereotype of blacks, especially young men, as violent, hostile, aggressive, and dangerous." Id.; see also A. Rutbeck-Goldman & L. Richardson, "Race and Objective Reasonableness in Use of Force Cases: An Introduction to Some Relevant Social Science," 8 Ala. C.R. & C.L. L. Rev. 145, 149 (2017) ("[s]ocial science research over the last few decades suggests that we unconsciously associate [b]lack men with danger, criminality, and violence"). Implicit biases "linking [b]lacks with aggression have been shown to cause people to judge the behavior of a [b]lack person as more aggressive than the identical behavior of a [w]hite person," leading to higher rates of police violence and incarceration. K. Spencer et al., "Implicit Bias and Policing," 10 Soc. & Personality Psychol. Compass 50, 54 (2016); see also L. Richardson, supra, 2039 ("As a result of implicit biases, an officer might evaluate behaviors engaged in by individuals who appear black as suspicious even as identical behavior by those who appear white would go unnoticed. In other words, even when officers are not intentionally engaged in conscious racial profiling, implicit biases can lead to a lower threshold for finding identical behavior suspicious when engaged in by blacks than by whites."). Implicit biases are not limited to race; they also perpetuate subconscious gender stereotypes. Many individuals view women as "meek or submissive"; J. Cuevas & T. Jacobi, "The Hidden Psychology of Constitutional Criminal Procedure," 37 Cardozo L. Rev. 2161, 2181 (2016); and, thus, not prone to engage in violent behavior. This is not true, however, for women of color. Black women are often viewed as "hot-tempered, combative, and uncooperative," leading to higher rates of police violence and incarceration. F. Freeman, Note, "Do I Look Like I Have an Attitude? How Stereotypes of Black Women on Television Adversely Impact Black Female Defendants Through the Implicit Bias of Jurors," 11 Drexel L. Rev. 651, 655 (2019); see also N. Amuchie, " 'The Forgotten Victims' How Racialized Gender Stereotypes Lead to Police Violence Against Black Women and Girls: Incorporating an Analysis of Police Violence into Feminist Jurisprudence and Community Activism," 14 Seattle J. Soc. Just. 617, 646 (2016) ("[b]lack women and girls are viewed as [nonfeminine] or [unladylike], which leads to high levels of violence against them and excessive policing"). America, of course, has no monopoly on group

stereotypes of this nature. See, e.g., P. Lerner et al., "Introduction: German Jews, Gender, and History," in Jewish Masculinities (B. Baader et al. eds., 2012) p. 1 ("[t]he idea that Jewish men differ from non-Jewish men by being delicate, meek, or effeminate in body and character runs deep in European history").

[12] See *Jacobellis* v. *Ohio*, 378 U.S. 184, 197, 84 S. Ct. 1676, 12 L. Ed. 2d 793 (1964) (Stewart, J., concurring) (confessing his inability to define pornography in words but explaining that "I know it when I see it"). Justice Potter Stewart's candor is admirable and refreshing, but it is also troubling to those who believe that "the exercise of judicial power is not legitimate if it is based . . . on subjective will rather than objective analysis, on emotion [or instinct] rather than reasoned reflection." P. Gewirtz, Essay, "On 'I Know It When I See It,' " 105 Yale L.J. 1023, 1025 (1996). Some commentators, including Professor Gewirtz, consider such criticism unfair on the ground that it "mischaracterizes and understates the role that emotion and nonrational elements properly play in forming judicial [decision-making and opinion writing]." Id. I am not unsympathetic to Professor Gewirtz' general point, but my heart and mind are in agreement that "I know it when I see it" jurisprudence has no place in first amendment law.

[13] To cite one illustrative example of what I consider the unconvincing arguments offered by the majority to explain why the offensive speech was protected in *Baccala* but not here, the majority compares the nature of the addressee's job as an assistant store manager in *Baccala* to that of Michael McCargo, the parking enforcement officer in the present case, and opines that the store employee's supervisory status made her more likely to "[model] appropriate, responsive behavior, aimed at de-escalating the situation . . . ." (Internal quotation marks omitted.), quoting *State* v. *Baccala*, supra, 326 Conn. 253. Unlike the majority, I would place far greater weight on the fact that the addressee in this case was a government employee, not a private individual, as in *Baccala*. This factor, though not dispositive, traditionally and commonsensically weighs strongly in favor of according the speaker greater first amendment protection. See, e.g., *Houston* v. *Hill*, 482 U.S. 451, 462, 107 S. Ct. 2502, 96 L. Ed. 2d 398 (1987) ("a properly trained officer may reasonably be expected to exercise a higher degree of restraint than the average citizen, and thus be less likely to respond belligerently to fighting words" (internal quotation marks omitted)), quoting *Lewis* v. *New Orleans*, 415 U.S. 130, 135, 94 S. Ct. 970, 39 L. Ed. 2d 214 (1974) (Powell, J., concurring in the result); *United States* v. *Poocha*, 259 F.3d 1077, 1081 (9th Cir. 2001) ("the area of speech unprotected as fighting words is at its narrowest, if indeed it exists at all, with respect to criminal prosecution for speech directed at public officials"); *Abudiab* v. *San Francisco*, 833 F. Supp. 2d 1168, 1175 (N.D. Cal. 2011) (parking control officer, "as a public official whose duties often incite the vitriol of the public, and who consequently is authorized to use force against members of the public (deployment of pepper spray in self-defense) . . . should be held to a higher standard of conduct in terms of his reaction to mere criticisms, profane and otherwise, of the manner in which he conducts his official duties"), aff'd sub nom. *Abudiab* v. *Georgopoulos*, 586 Fed. Appx. 685 (9th Cir. 2013); *In re Nickolas S.*, 226 Ariz. 182, 188, 245 P.3d 446 (2011) ("a student's profane and insulting outburst" was not fighting words because "Arizona teachers exemplify a higher level of professionalism"); *State* v. *Baccala*, supra, 326 Conn. 244 ("a majority of courts, including ours, hold police officers to a higher standard than ordinary citizens when determining the likelihood of a violent response by the addressee"). To be sure, McCargo was not a police officer, but he was employed as an agent of the government to walk the streets imposing monetary fines on members of the public for municipal parking violations. Parking enforcement officers, as the bearers of bad news, are in a very unpopular line of work and can expect to be subjected to varying levels of verbal abuse. See, e.g., T. Barrett, The Dangerous Life of a Parking Cop, The Tyee (April 2, 2004), available at https://thetyee.ca/Life/2004/04/02/The_Dangerous_Life_of_a_Parking_Cop/ (last visited August 26, 2020) (reviewing film about "the life of a parking enforcement officer," who explained that "physical assaults are rare, but verbal abuse is something that happens almost every day"); J. McKinley, "San Franciscans Hurl Their Rage at Parking Patrol," N.Y. Times, January 6, 2007, p. A12 (abuse on parking control officers is "common, often frightening and, occasionally, humiliating").

[14] The particular facts of the present case, and our consensus regarding the correct result here, ought not obscure the reality that demographic stereotypes and implicit biases relating to race will continue to plague this

doctrine. Conscious or unconscious racial stereotypes help to explain why some speech is deemed likely to incite violence, whereas other speech is not. See, e.g., A. Carr, supra, 31 Hastings Women's L.J. 229–30 ("For nonwhite Americans, racist stereotypes and diverging governmental and cultural norms about expressing public anger compound the complexities of [speech regulation]. Moreover, the state's responses to different individuals and groups' public displays of anger—as in protest actions—vary on the basis of race. For example, the recent cases of mass protests in Ferguson [Missouri, in 2014] and the Women's Marches (2017 onward) displayed enormous disparities: police responses to the [majority black] protesters in Ferguson were militarized and violent compared to the anodyne permissiveness of authorities toward the visibly white Women's March organizers and attendees. . . . Those [state individual] contexts include, among others, racist patterns of policing and incarceration, as well as profoundly asymmetric rates of arrest and prosecution. These considerations form a daunting backdrop for nonwhite (and non-male) listeners . . . in ways not contemplated by the [c]ourt in *Chaplinsky* and later cases. Black and brown Americans have myriad deeply rooted claims for condemning state authorities, for angrily castigating them in terms far harsher than Chaplinsky's censured utterance, but they also face far greater chances of harm if they choose to do so. Censure limits free speech rights; speaking out against racist systems often deprives speakers of color their very lives." (Footnotes omitted.)).

[15] I doubt that anyone would dispute that the actual statutory language promulgated by our legislature, which criminalizes the use of "abusive or obscene language" in a public place "with intent to cause inconvenience, annoyance or alarm"; General Statutes § 53a-181 (a) (5); plainly cannot pass muster under the void for vagueness doctrine without the aid of a workable narrowing construction. See *Gooding* v. *Wilson*, 405 U.S. 518, 523, 92 S. Ct. 1103, 31 L. Ed. 2d 408 (1972) (striking down Georgia's breach of peace statute in absence of such limiting construction while observing that "[its] decisions since *Chaplinsky* have continued to recognize state power constitutionally to punish 'fighting' words under carefully drawn statutes not also susceptible of application to protected expression"); see also *Plummer* v. *Columbus*, 414 U.S. 2, 2–3, 94 S. Ct. 17, 38 L. Ed. 2d 3 (1973) (striking down municipal ordinance providing that "[n]o person shall abuse another by using menacing, insulting, slanderous, or profane language" (internal quotation marks omitted)).